[No. 13057-6-III.    Division Three.    July 5, 1994.]

ROGER CRANE & ASSOCIATES, INC., ET AL, *Appellants,* v.
JAMES FELICE, ET AL, *Respondents.*

*Barry Ryan* and *Stanley A. Kempner, Jr.,* for appellants.
*Peter J. Grabicki* and *Randall & Danskin, P.S.; James S. Craven, Philip J. Van de Veer,* and *Evans, Craven & Lackie, P.S.,* for respondents.

SWEENEY, J. — Roger Crane & Associates, Inc., and William Brooks (Crane) sued James Felice and Robert Tomlinson d.b.a. Tomlinson South, Inc. (Tomlinson) for a portion of a real estate commission generated by the sale of Mr. Felice's home. The court granted Tomlinson's and Mr. Felice's motions for summary judgment, ruling that Mr. Brooks was not the procuring cause of the sale. Crane appeals. We affirm.

### FACTUAL BACKGROUND

Mr. Felice entered into an exclusive listing agreement with Tomlinson South, Inc., to sell his Spokane home. The agreement provided for a 6 percent commission in the "case of a sale or exchange". A commission of 3 percent was to be paid to any cooperating selling broker. The home was listed at $595,000.

In accordance with the agreement between Mr. Felice and Tomlinson, the property was listed on the Spokane Multiple Listing Service (MLS), which provides a "facility for the orderly correlation and dissemination of listing information". Multiple Listing Serv., Spokane Bd. of Realtors, *Restated Rules and Operational Procedures* (MLS Restated Rules and Operational Procedures) art. 1, § 1.1 (rev. 1990). According to article 1, section 1.1 of the MLS Restated Rules and Operational Procedures, submission of a listing to the MLS is "a blanket unilateral offer of subagency . . ." to other member realtors.

Mr. Brooks, a realtor with Roger Crane & Associates, had worked with Annie and Ed Chopot to find a home in Spokane since November 1990. He learned the Felice home was for sale through the MLS and in February 1991 recommended that the Chopots see it. He drove Mrs. Chopot past the Felice home but she did not like the looks of it from the outside.

Mr. Brooks convinced her to see the inside. On February 6, he called Tomlinson South to schedule an appointment to show the home to the Chopots. He arranged a viewing time, but the Chopots were unavailable. On March 6, Mr. Brooks called Mrs. Chopot to schedule the viewing of two homes,

one of which was the Felice home. He had arranged to have a Tomlinson agent show Mrs. Chopot the homes. On March 8 Mr. Brooks and Mrs. Chopot met a Tomlinson agent at the first of the two homes. After touring the first home, Mr. Brooks and Mrs. Chopot drove to the Felice home. The agent, however, did not meet them because he misunderstood which home Mrs. Chopot wanted to see. The Tomlinson agent had not made arrangements to show the Felice home and accordingly all agreed to reschedule the visit.

On Sunday, March 10, Walt Wolfe, a mutual friend of the Chopots and Mr. Felice, called the Chopots and told them about a home for sale. Mr. Wolfe, who is not a realtor, arranged for them to see it that afternoon. Upon arrival, the Chopots realized it was the Felice home. Mr. Chopot asked Mr. Felice if the home was listed. He said it was, but added that because he was a friend of Mr. Tomlinson he could get released from the listing agreement. The next day the Chopots saw the home for the second time. They again asked whether the home was listed and were given the same response. Although the record is unclear, they apparently did not tell Mr. Felice that Mr. Brooks had previously driven Mrs. Chopot past the house.

The Chopots offered Mr. Felice $550,000 for the home. Mr. Felice responded that the offer would be acceptable only if he could reduce the commission payable to Tomlinson. He agreed to speak to Mr. Tomlinson about the commission.

On March 12, Mr. Felice informed Mr. Tomlinson he did not want to pay a 6 percent commission on the sale because Tomlinson had not been involved in the Chopots' decision to buy the home. Mr. Tomlinson agreed to accept a reduced commission of $8,000. Mr. Felice accepted the Chopots' offer later that day. The Chopots and Mr. Felice arranged to meet to sign an earnest money agreement at Tomlinson's office the next day.

Mr. Chopot telephoned Mr. Brooks and informed him he was purchasing Mr. Felice's home. Melanie White, a designated broker for Crane, called the Tomlinson office as Mr. Tomlinson, Mr. Felice and the Chopots were meeting to sign

the earnest money agreement. She told them Crane and Mr. Brooks would insist on payment of a 3 percent commission as the selling agents. The Chopots told Mr. Tomlinson and Mr. Felice that Mr. Brooks had worked with them to locate a home and had shown Mrs. Chopot the outside of Mr. Felice's home.

The sale closed without payment of a commission to Crane or Mr. Brooks. Tomlinson was paid $8,000.

## PROCEDURAL HISTORY

Mr. Brooks brought this action against Mr. Felice, Mr. Tomlinson and Tomlinson South, Inc. Tomlinson moved for dismissal pursuant to CR 12(b)(6) and CR 56, asserting that Mr. Brooks lacked standing to sue because he was not a member of the MLS and therefore had no rights in the listing agreement. On May 7, 1992, Mr. Brooks filed an amended complaint, adding Roger Crane & Associates as a party plaintiff. Roger Crane & Associates is a member of the MLS. The amended complaint alleged breach of contract, intentional interference with a contract and violation of the Consumer Protection Act.

The court concluded as a matter of law that Mr. Brooks' efforts did not rise to the level of "a procuring cause" of the sale of Mr. Felice's home. It also ruled that Mr. Brooks had no individual standing to bring suit because he neither had a contract with Tomlinson nor was he a participant under the rules of the MLS. It granted Tomlinson's and Mr. Felice's motions for summary judgment. Crane appeals.

## DISCUSSION

The dispositive issue is whether there is a genuine issue of material fact that Mr. Brooks was a procuring agent in the sale of Mr. Felice's house. We hold there is not and affirm.

■ Standard of Review. The standard of review of a summary judgment is well settled. We engage in the same inquiry as the trial court and view the evidence in a light most favorable to the nonmoving party. *Grimsrud v. State*, 63 Wn. App. 546, 548-49, 821 P.2d 513 (1991); *Stephens v. Seattle*, 62

Wn. App. 140, 143, 813 P.2d 608, *review denied*, 118 Wn.2d 1004 (1991).

Real Party in Interest. Crane initially contends that the court erred in ruling Mr. Brooks had no standing to sue because he was not a "participant" under the MLS Restated Rules and Operational Procedures.[1] We decline to address this assignment of error for two reasons. First, our discussion of the broader issue of "procuring cause" is dispositive. Second, Mr. Brooks was allowed to amend his complaint to join Crane in the action.

Listing Agreement Language. Paragraph 7 of the listing agreement reads as follows:

> Total Commission. (Complete all applicable provisions). In the case of a sale or exchange, the total commission shall be 6 % of the total selling price . . .
>
> Commission is payable if the property or any portion thereof or any interest therein is, directly or indirectly, sold, exchanged, leased or optioned within 180 days following expiration of the term hereof to any person who has *examined, been introduced to, been shown* or been offered the property during the term hereof; provided that such commission shall not be payable in the event of such transaction following expiration of the term hereof under a then current listing agreement with another licensed real estate broker.
>
> Cooperating Broker's Share of Total Commission: 3 % of total selling price or $ — (complete whichever is applicable).

(Italics ours.)

Crane argues it is entitled to the 3 percent commission because Mr. Brooks introduced the Chopots to the property during the term of the listing agreement. It misreads the contract.

■ The language on which Crane relies is from that provision of the listing agreement commonly referred to as the "tail". The tail provides for the payment of a commission, in certain circumstances, after expiration of a listing agreement. The purpose of such agreements is set out in *Whiting*

---

[1] Article 13, section 13.18 of the MLS Restated Rules and Operational Procedures defines participant to mean "a person who has qualified as a Participant under the Bylaws of the Board, has executed an MLS Participant's Agreement . . . and has thereby agreed in writing to conform to these Rules and Operational Procedures . . .".

*v. Johnson*, 64 Wn.2d 135, 140, 390 P.2d 985 (1964) (quoting *Messick v. Powell*, 314 Ky. 805, 236 S.W.2d 897, 27 A.L.R.2d 1341 (1951)):

real estate brokerage is a highly competitive business and it is a logical conclusion that the provision was intended to protect the agent beyond the duration of the exclusive 'agency or right' to sell the property in order that he might not be deprived of his compensation for finding and presenting a purchaser during that period should the owner sell to him. Without such protection, it would have been an easy matter for the owners to circumvent his right by postponing acceptance until the definite time had expired.

*See also Clients' Serv., Inc. v. Pupo*, 71 Wn.2d 610, 430 P.2d 552 (1967). The language of the tail is not at issue here; this property was sold well within the effective dates of the listing agreement. Mr. Brooks must therefore be the procuring cause of this sale to qualify for the commission. *Willis v. Champlain Cable Corp.*, 109 Wn.2d 747, 754, 748 P.2d 621 (1988).

We are not persuaded by Crane's argument that the listing agreement is a binding presently enforceable contract because of the MLS compact among member realtors.

A listing agreement is a unilateral contract and until performance by Crane, the putative subagent, there was no obligation to pay Crane a commission. *Multicare Med. Ctr. v. Department of Social & Health Servs.*, 114 Wn.2d 572, 584, 790 P.2d 124 (1990); *Cook v. Johnson*, 37 Wn.2d 19, 23, 221 P.2d 525 (1950) (unilateral contract is an offer by one party to do a certain thing in the event other party performs a certain act); *Higgins v. Egbert*, 28 Wn.2d 313, 317, 182 P.2d 58 (1947) (unilateral contract is in reality merely an offer to contract). The language of the MLS Restated Rules and Operational Procedures does not require a different result. Article 1, section 1.1 of the MLS Restated Rules and Operational Procedures states that a listing creates a "blanket unilateral offer of subagency . . .". Here, the performance required by Crane to accept the unilateral offer of subagency, and create a binding contract, was presentment of a ready, willing and able buyer or presentment of an offer to purchase the Felice home.

<u>Procuring Cause</u>. Crane contends that even if we apply the procuring cause rule, a material issue of fact exists as to whether Mr. Brooks was the procuring or efficient cause of the sale. We disagree.

■ A real estate broker is entitled to a commission when he or she procures a purchaser who is accepted by the principal and with whom the principal enters into a binding, enforceable contract. *Bonanza Real Estate, Inc. v. Crouch*, 10 Wn. App. 380, 385, 517 P.2d 1371 (1974); *Center Invs., Inc. v. Penhallurick*, 22 Wn. App. 846, 850, 592 P.2d 685 (1979). The broker must set in motion the series of events culminating in the sale "and, in doing so, accomplish what he undertook under the agreement." *Bonanza*, at 385; *Feeley v. Mullikin*, 44 Wn.2d 680, 683, 269 P.2d 828 (1954). Mere commencement of performance is not sufficient. *Frink v. Gilbert*, 53 Wash. 392, 397, 101 P. 1088 (1909). "[W]hen a party is employed to procure a purchaser and does procure a purchaser to whom a sale is eventually made, he is entitled to a commission regardless of who makes the sale if he was the procuring cause of the sale." *Willis*, at 754; *Agranoff v. Jay*, 9 Wn. App. 429, 435, 512 P.2d 1132 (when real estate broker procures a prospective buyer who is accepted by the seller, the broker has earned the promised commission), *review denied*, 82 Wn.2d 1013 (1973).

■ The determination of whether the activity of a broker was the procuring cause of a sale is generally a question of fact. *Zelensky v. Viking Equip. Co.*, 70 Wn.2d 78, 91, 422 P.2d 293 (1966); *see Quadrant Corp. v. Spake*, 8 Wn. App. 162, 173, 504 P.2d 1162, *review denied*, 82 Wn.2d 1004 (1973). If, however, reasonable minds can reach but one conclusion, it may be determined as a matter of law. *Ruffer v. St. Frances Cabrini Hosp.*, 56 Wn. App. 625, 628, 784 P.2d 1288, *review denied*, 114 Wn.2d 1023 (1990). We conclude that reasonable minds could not differ on the issue of whether Mr. Brooks was the procuring cause of this sale for two reasons. First, Mr. Brooks' efforts with respect to the Felice home were minimal. When reduced to its essence, he talked to the Chopots about the home and drove Mrs.

Chopot past it. He arranged a viewing, but because of unrelated events did not take Mrs. Chopot inside. Although he wanted to be and tried to be instrumental in the sale of the property, the trial court accurately noted "the fact remains that there's nothing in this record to support any indication then that he did any more than take this buyer by the house once, or at least one of them, where they viewed it from the outside and drove on." The record does not indicate there was a clear connection between Mr. Brooks' activities and the ultimate sale of the Felice home. *Lloyd Hammerstad, Inc. v. Saunders*, 6 Wn. App. 633, 636, 495 P.2d 349, 51 A.L.R.3d 1145 (1972).

Second, and more significantly, the procuring cause which set in motion the chain of events ultimately resulting in the sale here was Mr. Wolfe. *Feeley*, at 683; *see also Quadrant Corp.*, at 173. Even viewing the evidence in a light most favorable to Mr. Brooks, he did not set in motion a series of events or negotiations culminating in the sale; Mr. Wolfe did. Again, Mr. Brooks hoped to be the procuring agent. He tried to be the procuring agent but ultimately he was not.

Decisions from other jurisdictions are in accord. *Staubus v. Reid*, 652 S.W.2d 293 (Mo. Ct. App. 1983) (broker's efforts must set in motion a series of events which, without break in continuity, eventually culminates in a sale); *Briggs v. Rector*, 88 A.D.2d 778, 451 N.Y.S.2d 520 (1982) (duty of broker is to bring buyer and seller to agreement; until that is done his right to commission does not accrue). The trial court did not err in awarding summary judgment in favor of Tomlinson and Mr. Felice.

Business Relationship. Crane next contends the court erred in holding, as a matter of law, that Mr. Felice did not interfere with a business relationship or otherwise act in bad faith. Crane asserts Mr. Felice's action suggests a secret arrangement between the Chopots and Mr. Felice to avoid payment of the commission.

A claim for tortious interference with a contractual relationship or business expectancy requires five elements:

1. The existence of a valid contractual relationship or business expectancy [with a third party];
2. That defendants had knowledge of that relationship;
3. An intentional interference inducing or causing a breach or termination of the relationship or expectancy;
4. That defendants interfered for an improper purpose or used improper means; and
5. Resultant damages.

*Miller v. U.S. Bank of Wash., N.A.,* 72 Wn. App. 416, 428, 865 P.2d 536 (1994) (quoting *Commodore v. University Mechanical Contractors, Inc.,* 120 Wn.2d 120, 137, 839 P.2d 314 (1992)).

Even assuming for the sake of this discussion that Crane and Mr. Brooks had a valid business expectancy, the record indicates Mr. Felice had no knowledge of Mrs. Chopot's earlier viewing of the Felice home with Mr. Brooks. Thus, the second element has not been established. This record is also devoid of any evidence, or reasonable inference, that Mr. Felice intentionally interfered with Mr. Brooks' relationship with the Chopots. Nor is there evidence from which to infer an improper purposeful intent. The trial court held there was no demonstration of any intentional conduct by Mr. Felice or Tomlinson to cut anyone out of a commission. The affidavits submitted on summary judgment support this conclusion, and we agree.

Bad Faith. Crane also alleges the court erred in ruling there was no material issue of fact as to whether Tomlinson and Mr. Felice acted in bad faith in avoiding the payment of any commission. It asserts that at least an issue of fact exists because knowledge of Mr. Brooks' involvement with the Chopots should be imputed to Mr. Felice and Tomlinson based on: the lengthy period of time Mr. Felice's home was on the market, Mr. Felice's sudden intervention, and Mr. Felice's statement to the Chopots that the $550,000 price would be acceptable if he could reduce the commission payable. We disagree.

Affidavits submitted in support of, or in response to, a summary judgment motion must set forth facts that would be admissible in evidence. CR 56(e). Unless an affidavit sets

forth facts, evidentiary in nature, that is, information as to "what took place, an act, an incident, a reality as distinguished from supposition or opinion", the affidavit does not raise a genuine issue for trial. *Grimwood v. University of Puget Sound, Inc.*, 110 Wn.2d 355, 359, 753 P.2d 517 (1988). Ultimate facts, conclusions of fact, or conclusory statements are insufficient to raise a question of fact. *Grimwood*, at 359-60.

Crane's bare allegations do not raise a genuine issue of material fact. Its allegations of bad faith are conclusions, not evidence. Further, they need not be considered because they are not supported by authority or citations to the record. RAP 10.3(a)(5); *American Legion Post 32 v. Walla Walla*, 116 Wn.2d 1, 7, 802 P.2d 784 (1991) (appellate court need not consider a contention that is not supported by argument or citation to authority). The court did not err.

*Consumer Protection Act.* Finally, Crane contends a material issue of fact exists as to whether Tomlinson violated the Consumer Protection Act (CPA). Crane asserts that even though the trial court did not address this issue in its ruling, there are material issues of fact as to whether Tomlinson's conduct violated RCW 18.85.230.[2]

---

[2]Crane asserts Tomlinson violated the following provisions of RCW 18.85.230:

"The director may, upon his or her own motion, and shall upon verified complaint in writing by any person, investigate the actions of any person engaged in the business or acting in the capacity of a real estate broker, associate real estate broker, or real estate salesperson, regardless of whether the transaction was for his or her own account or in his or her capacity as broker, associate real estate broker, or real estate salesperson, and may impose any one or more of the following sanctions: Suspend or revoke, levy a fine not to exceed one thousand dollars for each offense, require the completion of a course in a selected area of real estate practice relevant to the section of this chapter or rule violated, or deny the license of any holder or applicant who is guilty of:

". . . .

"(4) Making, printing, publishing, distributing, or causing, authorizing, or knowingly permitting the making, printing, publication or distribution of false statements, descriptions or promises of such character as to reasonably induce any person to act thereon, if the statements, descriptions or promises purport to be made or to be performed by either the licensee or his or her principal and the licensee then knew or, by the exercise of reasonable care and inquiry, could have known, of the falsity of the statements, descriptions or promises;

"(5) Knowingly committing, or being a party to, any material fraud, misrepresentation, concealment, conspiracy, collusion, trick, scheme or device

■■ To establish a claim under the CPA, there are five elements which must be proved: "(1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; (5) causation." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780, 719 P.2d 531 (1986). Whether a particular action gives rise to a violation under the CPA is reviewable as a question of law. *Keyes v. Bollinger*, 31 Wn. App. 286, 289, 640 P.2d 1077 (1982).

■ Reviewing the alleged error de novo, Crane has not presented evidence to establish even the first CPA element: an unfair or deceptive act or practice. To establish the first element of a private CPA action, the plaintiff must show that the act in question had "the capacity to deceive a substantial portion of the public". (Italics omitted.) *Hangman Ridge*, at 785. Crane has not established that the listing agreement stating the cooperating broker's commission would be 3 percent had a capacity to deceive. Tomlinson is not accountable for any confusion, or tendency to deceive, in the rules and regulations of the Spokane MLS.

In sum, Mr. Books was not the procuring cause of the sale of Mr. Felice's residence to the Chopots. The order of summary judgment in favor of Tomlinson and Mr. Felice is affirmed. Crane's request for an award of attorney fees on appeal is denied.

THOMPSON, C.J., and MUNSON, J., concur.

---

whereby any other person lawfully relies upon the word, representation or conduct of the licensee;

"....

"(25) In the case of a broker licensee, failing to exercise adequate supervision over the activities of his or her licensed associate brokers and salespersons within the scope of this chapter;

"(26) Any conduct in a real estate transaction which demonstrates bad faith, dishonesty, untrustworthiness or incompetency;".