[No. 14130-6-III.    Division Three.    March 12, 1996.]

PROFESSIONALS 100, *Respondent*, v. PRESTIGE REALTY, INC., *Appellant*.

834

*Craig L. Smith*, for appellant.

*James S. Berg* and *Halverson & Applegate, P.S.*, for respondent.

THOMPSON, J. — Prestige Realty, Inc. (Prestige) appeals a judgment awarding Professionals 100 (Pro 100) one-half of a real estate commission generated by the sale of two nursing homes, together with prejudgment interest, costs and attorney fees. The judgment was entered after the trial court determined that Pro 100 was the procuring cause of the sale and had provided a buyer as required by a written contract. Prestige contends the procuring cause of sale rule does not apply and, even if it did, Pro 100 was not a procuring cause of the sale, nor did it provide a buyer as the contract required. We affirm.

FACTS

In 1988, Carey Erwin, an employee of Pro 100, contacted an employee of West Valley Nursing Homes, Inc., to ascertain if West Valley was interested in selling any of its nursing homes. The West Valley employee indicated there was such an interest and referred Mr. Erwin to Kenneth Pottenger, broker and president of Prestige and a member of West Valley's board of directors. Mr. Erwin contacted Mr. Pottenger, and after several contacts, Mr. Pottenger sent Mr. Erwin a letter authorizing him to help market West Valley's nursing home in Bothell. The letter,

dated June 21, 1988, stated that Prestige would share with Pro 100 on a "50/50 basis the total Commissions earned at closing."

Mr. Erwin contacted John McClay of Stan Wiley, Inc., who also was involved in buying and selling health-care facilities. He told Mr. McClay about the nursing home in Bothell. Mr. McClay, in turn, contacted North Pacific. In September 1988, North Pacific leased West Valley's Bothell and Enumclaw nursing homes and was granted an option to purchase both facilities for $4,500,000. Stan Wiley, Inc., Pro 100 and Prestige each received one-third of the commission for their involvement in the lease/option transaction.

North Pacific subsequently contacted Mr. McClay and asked him to broker their leasehold/option interests in the Bothell and Enumclaw facilities. Mr. Erwin testified that Mr. McClay called him sometime during the first part of September 1989, and informed him of the listing. Mr. Erwin then contacted Mr. Pottenger. At trial, Mr. Erwin testified that he told Mr. Pottenger that North Pacific would not be able to sell its interest for $4,500,000 and was asked what they were worth. In response, Mr. Erwin sent Prestige a letter dated September 26, 1989, setting forth his market value analysis of the two facilities. He valued them at $2,075,000 to $2,960,000.

Franciscan Eldercare Corporation became aware of North Pacific's listing with Mr. McClay. Although interested, Franciscan Eldercare thought the $4,500,000 price was too high and did not want a lessee to operate the facilities. Franciscan Eldercare was represented by Mr. Steensland.

In September 1989, West Valley gave Prestige an exclusive listing of the Bothell and Enumclaw nursing homes. Both listings were withdrawn the following month and replaced with an exclusive listing of all West Valley nursing homes and adjacent properties, to be sold as a package. The Bothell and Enumclaw facilities were listed at $3,000,000. Mr. Pottenger, on behalf of Prestige, sent

Mr. Erwin a letter dated October 9, advising him he would "share the commissions paid on the closing of any transaction whereby you provide a buyer on a 50/50 basis." Mr. Pottenger also agreed on behalf of Prestige to "protect and respect your clientel[e] list and . . . attempt to refer all inquiries to you."

After receipt of the letter from Prestige, Mr. Erwin contacted Mr. McClay and told him the Bothell and Enumclaw facilities were for sale for $3,000,000. Mr. McClay expressed surprise at the price, then told Mr. Erwin he was aware of a broker in Gig Harbor, Washington, who had a connection with a potential buyer "back east." Mr. McClay subsequently contacted Mr. Steensland who, in turn, contacted his client, Franciscan Eldercare. When Franciscan expressed an interest, Mr. Steensland contacted Mr. Pottenger. Mr. Pottenger passed the information about the identity of the potential purchaser on to Mr. Erwin, who then contacted Mr. Wimer, Franciscan Eldercare's representative.

After certain impediments to sale were removed and considerable negotiations took place, the Bothell and Enumclaw facilities were sold to Franciscan Eldercare in May 1991, along with the other nursing homes owned by West Valley. As a result of that sale, Prestige received a commission of $160,000. Mr. Steensland was paid at closing by the purchaser pursuant to a separate agreement. When Pro 100 did not receive one-half the commission paid to Prestige, this lawsuit was commenced.

Following a bench trial, the court awarded judgment to Pro 100 for $80,000 plus prejudgment interest, costs and attorney fees.

## PROCURING CAUSE OF SALE RULE

We first determine whether, as a matter of law, the procuring cause of sale rule or the contract terms governed the payment of commissions to Pro 100.

■ Under the procuring cause of sale rule, when a party

is employed to procure a purchaser and does procure a purchaser to whom a sale is eventually made, that party is entitled to a commission regardless of who makes the sale. *Willis v. Champlain Cable Corp.*, 109 Wn.2d 747, 754, 748 P.2d 621 (1988) (citing *Feeley v. Mullikin*, 44 Wn.2d 680, 683, 269 P.2d 828 (1954)). The rule has been applied primarily to real estate transactions involving oral agreements between brokers and sellers with a subsequent writing between sellers and buyers. *Willis*, 109 Wn.2d at 755.

██ When a written contract provides for the manner in which commissions will be paid, the terms of the contract control unless the contract is ineffective due to illegality, lack of capacity, or otherwise. *See Willis*, 109 Wn.2d at 755-56. *Cf. Roger Crane & Assocs., Inc. v. Felice*, 74 Wn. App. 769, 875 P.2d 705 (1994) (procuring cause rule applied because listing agreement did not apply to commissions due after the listing expired).

Here, the October 9, 1989 letter from Mr. Pottenger to Mr. Erwin set forth the terms for payment of commissions to Pro 100. It was admitted as plaintiff's exhibit 8 without objection. Mr. Erwin testified that the letter confirmed the understanding he had with Mr. Pottenger regarding commission sharing. Mr. Pottenger also testified the letter set forth the agreement regarding the sharing of commissions. The letter states that Prestige would "share the commissions paid on the closing of any transaction whereby you provide a buyer . . . ."

Based on the parties' presentation of the case, the trial court framed the legal issue as whether Mr. Erwin provided a buyer within the terms of the parties' letter agreement *or* was a procuring cause of the sale. The trial court determined that the language of the agreement— "provide a buyer"—was consistent with the concept of "procuring cause of sale." We agree. Although a contract could provide for payment of commissions to a broker for

being something less than the procuring cause of a sale, the language in this contract does not so provide.

## CHALLENGED FINDINGS AND CONCLUSIONS

■ We next determine whether the challenged trial court's findings of fact are supported by substantial evidence and whether they support the challenged conclusions of law.

The question of whether Mr. Erwin performed under the contract by providing a buyer involved questions of fact disputed by the parties at trial. After hearing the testimony of Mr. Erwin, Mr. Pottenger, Mr. Steensland, and Calvin Crowell,[1] and after reading the transcript of the telephonic deposition of Mr. Wimer, the trial court entered the following findings relevant to the question of whether Mr. Erwin provided a buyer under the parties' contract:

> 17. Prior to the execution of the letter agreement (Exhibit 8), Mr. Erwin provided information, including his expert opinion and market value assessment, to West Valley Nursing Homes, Inc., through Mr. Pottenger, which was a significant factor, although not the only factor, (other factors included, but were not limited to, the fact that North Pacific was delinquent in its lease payments, the fact that North Pacific had failed to pay the property taxes, the fact that North Pacific had asked for a loan from the board and the knowledge that North Pacific was attempting to sell its position as lessee) in West Valley's decision to list the Bothell and Enumclaw nursing homes for a sales price of $3,000,000 and to lower the selling price for the Bothell and Enumclaw nursing homes from approximately $4,500,000 to approximately $3,000,000. . . .
>
> . . . .
>
> 21. In October of 1989, Mr. Erwin, during a conversation with Mr. McClay, advised him of the availability of the Bothell and Enumclaw nursing homes for $3,000,000. Upon hear-

[1]Mr. Crowell was the executive director of West Valley Nursing Homes d/b/a Living Care Centers.

ing this information, Mr. McClay advised Mr. Erwin that he was aware of a potential buyer from "back east" that was represented by a broker in Gig Harbor, Washington. Mr. McClay did not provide Mr. Erwin with the names of either the potential buyer or the broker.

22. Franciscan Eldercare Corporation has its offices near Philadelphia, Pennsylvania and Mr. Steensland maintains his office in Gig Harbor, Washington.

23. Following the conversation with Mr. Erwin wherein he learned of the availability of the Bothell and Enumclaw properties for approximately $3,000,000, Mr. McClay provided this information to Franciscan Eldercare by contacting Mr. Steensland.

24. Mr. Steensland transferred this information on to his client, Franciscan Eldercare, whose representative was Mr. Mark Wimer.

25. Franciscan Eldercare became more interested in the Bothell and Enumclaw nursing home properties at the listed sales price of $3,000,000 rather than the option to purchase price of $4,500,000.

26. Thereafter, Mr. Steensland contacted Mr. Pottenger, regarding the availability of the Bothell and Enumclaw nursing homes for $3,000,000, through a telephone call on or about November 2, 1989. This contact was made because of the information Mr. Steensland had received from Mr. McClay[.]

27. On or about November 16, 1989, Mr. Pottenger received a letter of interest from Mr. Wimer regarding the subject properties.

28. Mr. Pottenger learned of the names of the specific agent (Mr. Steensland) and the potential purchaser (Franciscan Eldercare) before Mr. Erwin learned of them, the latter of which occurred on or about November 30, 1989, although Mr. Erwin was aware that a particular entity from "back east," represented by a broker from Gig Harbor, was possibly interested.

29. While Mr. Pottenger was not required to do so, he passed the information about the identity of the potential purchaser on to Mr. Erwin, who then contacted Mr. Wimer

840

directly. The action of providing this information to Mr. Erwin was consistent with the language of the letter agreement (Exhibit 8), which provided that Mr. Pottenger "will attempt to refer all inquiries to you." Mr. Pottenger was aware that Mr. Erwin was intending to contact Mr. Wimer, and that he did contact Mr. Wimer.

30. Mr. Erwin's initial contact with Mr. Wimer was by telephone on or about December 1, 1989.

31. Mr. Erwin spent a considerable amount of time and effort in persuading Franciscan Eldercare, through its president, Mr. Wimer, to purchase all of the North Pacific properties, including the Bothell and Enumclaw nursing homes which North Pacific was leasing. This was done through many phone conversations, as evidenced by Exhibit 22, (Telephone Log), two in-person meetings with Mr. Wimer, and by fostering conditions designed to increase the receptivity of Franciscan Eldercare to purchase the properties, including helping to plan a complicated transaction which removed impediments of a sale such as the lease/option to purchase held by North Pacific. That impediment was ultimately removed by a settlement finally reached through legal counsel for North Pacific and West Valley. Mr. Erwin also spend [sic] significant time and effort attempting to sell the property to others as well, including Regency Care Centers.

32. Mr. Erwin always bypassed Mr. Steensland, rather worked directly with Mr. Wimer. This means of dealing with Franciscan Eldercare was done at the request of Mr. Wimer. Messrs. Steensland and Pottenger were generally unaware of the contacts that were taking place between Messrs. Wimer and Erwin, although Mr. Pottenger has some knowledge that Mr. Erwin was periodically contacting Mr. Wimer.

33. Such direct dealings between Mr. Erwin and Mr. Wimer were unusual, but not forbidden. Mr. Pottenger neither approved nor prohibited Mr[.] Erwin from contacting Mr[.] Wimer directly.

34. Because of Mr. Pottenger's general lack of knowledge about the extent of contacts that were maintained between Messrs. Erwin and Wimer, he was understandably skeptical and surprised when Mr. Erwin claimed that he had been

instrumental in the sale of the properties to Franciscan Eldercare and was therefore entitled to share in the commissions earned.

. . . .

39. Franciscan Eldercare would not have been likely to purchase the subject properties but for the efforts of Mr. Erwin.

. . . .

41. Mr. Erwin's efforts set in motion a series of events that culminated in the sale to Franciscan Eldercare.

■ ■ As Pro 100 contends, Prestige has failed to comply with RAP 10.3(a) by assigning error to specific findings set out verbatim in the brief. However, it is clear which findings and conclusions are being challenged. This court's consideration of the challenged findings and conclusions is limited to whether there is sufficient evidence to support the findings and whether the findings support the trial court's conclusions of law. *Willener v. Sweeting*, 107 Wn.2d 388, 393, 730 P.2d 45 (1986). Unchallenged findings are verities on appeal. *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994).

Challenged findings of fact 17, 29 and 41 are supported by substantial evidence. Mr. Erwin testified that as part of his marketing of the facilities at issue, he contacted Mr. McClay to advise him of their price and availability.[2] Mr. Steensland testified that he was contacted by Mr. McClay and given information about what facilities were available and the price of those facilities. Mr. Steensland contacted his client, Franciscan Eldercare, through Mr. Wimer. Mr. Steensland contacted Mr. Pottenger and Mr. Pottenger contacted Mr. Erwin.

---

[2]The testimony established that Mr. McClay represented North Pacific until approximately November 1989. Mr. Wimer testified that when he was working out the details of Franciscan Eldercare's purchase, Mr. McClay's representation of North Pacific had been terminated by North Pacific. A letter from Mr. Steensland to Mr. Pottenger, dated November 25, 1992, also contained a reference to Mr. McClay having been dismissed as North Pacific's agent in November 1989. This is corroborated by Mr. Erwin's testimony.

Mr. Wimer testified that the reduction in the purchase price for the Bothell and Enumclaw facilities was a significant factor in Franciscan Eldercare's decision to purchase those facilities. He did not recall any specific conversations with Mr. Pottenger and stated he did not want to contact him in order to avoid antagonizing North Pacific. Mr. Wimer said he had numerous conversations with Mr. Erwin which he described as follows:

> [Mr. Erwin] was constantly trying to find a way to get the deal done. Every time we'd run into a little roadblock, he'd come up with a potential way to get over the roadblock. At one point he even tried to bring another party into the transaction so that we could potentially split it up. Because, again, . . . the two things that I was most interested in were the existing operation in Tacoma and the ability to construct a new operation in Tacoma, and so Karey [Carey Erwin] was trying to find a way to get this transaction done.

Mr. Pottenger testified he never initiated any call to either Mr. Wimer or to Mr. Steensland.

■ On appeal, findings of fact are presumed correct. *Fisher Properties, Inc. v. Arden-Mayfair, Inc.*, 115 Wn.2d 364, 369, 798 P.2d 799 (1990); *Thor v. McDearmid*, 63 Wn. App. 193, 205, 817 P.2d 1380 (1991). The party claiming error has the burden of showing that a challenged finding is not supported by substantial evidence. *Fisher*, 115 Wn.2d at 369. Prestige has not met its burden.

■ If a party sets in motion the series of events culminating in a sale, the party is said to be the procuring cause of the sale. *See Roger Crane & Assocs., Inc.*, 74 Wn. App. 769. Similarly, if a party sets in motion the series of events culminating in a sale, the party can be said to have provided the buyer. The challenged findings, coupled with the unchallenged findings, support the trial court's conclusions that (1) Mr. Erwin provided a buyer within the meaning of the parties' contract and (2) that under the terms of the contract, he was entitled to one-half of the commission earned on the sale to Franciscan Eldercare.

We affirm.

SWEENEY, C.J., and MUNSON, J., concur.