[No. 29322-0-III.    Division Three.    September 15, 2011.]

WASHINGTON PROFESSIONAL REAL ESTATE, LLC, *Appellant*, v. KIPP YOUNG ET AL., *Respondents*.

*Frank J. Falk Jr.* (of *Finney Falk Lawrence-Berrey & Naught PLLP*), for appellant.

*Daniel R. Case* (of *Larson Berg & Perkins PLLC*), for respondents.

*Brian C. Balch* on behalf of Washington Realtors, amicus curiae.

¶1 SIDDOWAY, J. — Dr. Kipp and Carmen Young entered into an exclusive listing agreement with Prudential Almon Realty for the sale of their Yakima home. Within five weeks after the expiration of the listing period, the Youngs entered into a binding contract for sale to purchasers who Prudential claims learned of the home through its marketing efforts. The trial court dismissed Prudential's claim for a commission under the "tail" provision of the listing agreement on summary judgment and awarded the Youngs

contractual attorney fees. We conclude that disputed facts and choices among reasonable inferences to be drawn from the evidence present issues for the trier of fact, and therefore reverse the trial court's orders and remand.

## FACTS AND PROCEDURAL BACKGROUND

¶2 We are reviewing summary judgment dismissal of Prudential's claims and therefore recount the evidence and reasonable inferences therefrom in the light most favorable to Prudential, the nonmoving party. *Lybbert v. Grant County*, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000).

¶3 Dr. Kipp Young and Carmen Young entered into an exclusive listing agreement with Prudential to sell their home on Noble Hill Road in Yakima. The listing agreement expired on December 31, 2008. It contained a "tail" provision under which Prudential was entitled to be paid the commission provided by the agreement if the home sold within 365 days following expiration of its term under certain circumstances, including if the home was sold, directly or indirectly, "to any person . . . to whose attention the Property was brought through the signs, advertising, or any other action or effort of [Prudential]" during the term of the agreement. Clerk's Papers (CP) at 37, ¶ 8(a).

¶4 In September or October 2008, Dr. John Place was riding his motorbike in the Noble Hill area when he saw Prudential's sign and brochure box in the front yard of the Young home. At the time, Dr. Place was lobbying his sister and brother-in-law, Pat and Tom Eastman, both physicians working in Nebraska, to move to Yakima; he hoped his brother-in-law would join his orthopedic practice. As part of his recruitment effort, he was looking at homes that were available in different parts of town and speaking with his sister about looking at realty websites. Believing the Eastmans would be interested in the Young home, Dr. Place stopped and took one of Prudential's brochures depicting and describing the property. Upon arriving home, he men-

tioned the Young home to his wife and showed her the brochure, but did not immediately forward information on the home to his sister. In the months that followed, Dr. Place was in the Noble Hill neighborhood a few times visiting the Youngs' next door neighbors, Dr. Bob Rockwell and Linda Rockwell, whom he knew well. He noticed that the Prudential sign remained in the Youngs' yard.

¶5 By late November or early December, the Eastmans decided they would move to Washington and would begin looking for a home in Yakima after the Christmas holiday. According to Dr. Pat Eastman[1] she contacted two real estate agents employed by Creekside Realty "right after Christmas" seeking assistance in finding a home. CP at 63. Dr. Place was also helping by, in her words, "firing off e-mails, you might want to look at this house on line and that house on line." CP at 65. Dr. Eastman and Dr. Place both testified that Dr. Place eventually e-mailed the address of the Young home to Dr. Eastman as one she and her husband should see. The e-mail was not in evidence, but both Dr. Eastman and Dr. Place testified that he e-mailed her the information on or about January 15, 2009, in anticipation of her impending house-hunting visit to Yakima. Dr. Eastman e-mailed the information in turn to her agents as a home she was interested in looking at, but by January 2009 the agents found no current listing for it.

¶6 Dr. Eastman flew to Yakima on January 22 and spent the full day on Friday, January 23, looking at homes with the Creekside agents and Dr. Place. The Young home was not on the agents' list. After they had looked at other homes, Dr. Place suggested that they drive by and look at the Young home. Upon arriving, they could see that there was no longer a sign indicating that the home was for sale. At Dr. Place's urging, they drove up the Rockwell driveway in order to look at the home from the Rockwells' yard. Because

---

[1] We hereafter refer to Dr. Pat Eastman simply as Dr. Eastman, given her more significant role in our recount of the facts. To distinguish her husband, we refer to him as Dr. Tom Eastman.

Dr. Eastman was interested in the property, Dr. Place said he would have his wife contact Linda Rockwell to find out whether the home had sold and, if not, whether the owners were still interested in selling. Either through a contact by Dr. Place's wife or a chance meeting the next morning, when Dr. Place, his wife, and the Eastmans ran into the Rockwells while out for breakfast, they obtained Linda Rockwell's agreement to contact the Youngs and inquire. Dr. Young called the Eastmans that afternoon and arranged for them to stop by and look at the home the next morning. Dr. Young said "he didn't want a realtor there," so the Eastmans did not take their agents when they went to the Young home to look at it the next day. CP at 227-28.

¶7 The Eastmans were sufficiently interested to request a second walk-through on Tuesday or Wednesday, January 27 or 28; this time, wanting the opinions and advice of their agents, they took them along. Dr. Young was surprised to see the real estate agents and told them that while they were free to trail along, his home was "off the market." CP at 188. During this visit, there was some discussion with Dr. Young about liability for a commission to Prudential if the property sold. Had the Youngs paid the six percent commission to Prudential provided by the listing agreement, Creekside would be entitled to share it as a cooperating broker under rules of the multiple listing service (MLS) to which Prudential and Creekside belonged. Dr. Young told the Eastmans that he would "handle" any commission claim by Prudential; Dr. Eastman inferred that he might disclaim liability to pay. CP at 229.

¶8 Creekside prepared an offer by the Eastmans for the property on January 28 and delivered it to the Youngs. To prepare the offer, the agents pulled up the prior MLS listing information posted by Prudential. Because of the ambiguity of Dr. Young's intentions vis-à-vis Prudential, the terms of the Eastmans' offer included that the Youngs would pay Creekside a three percent commission it would have received as a cooperating broker from Prudential if Pruden-

tial were paid. On January 29, the Youngs made a counter-offer, striking all provisions relating to commissions, including the requirement to pay a commission to Creekside. After more counteroffers, the Youngs accepted a January 31 counteroffer from the Eastmans on February 2.

¶9 In the meantime, Chris Pauling, the broker for Prudential, had learned of the Eastman offer, contacted Dr. Young, and requested a meeting to discuss the listing commission. On January 29, Dr. Young met with Mr. Pauling and the listing agent, Meg Irwin, at Prudential's office. Dr. Young told Mr. Pauling and Ms. Irwin that the Eastmans learned of the home's availability from the Rockwells, who knew that the Youngs planned to sell their property before it was ever listed with Prudential or any other broker. Dr. Young contends that when contacted by Linda Rockwell, she told him the Eastmans were friends of hers and that she was providing their names in the event the Youngs wished to talk to them about their interest in the home. Given the circumstances as described, Mr. Pauling and Ms. Irwin agreed that the tail provision would not apply. They nonetheless offered to assist with the closing for a reduced commission, but Dr. Young declined; according to Dr. Young, he "didn't want to then muddy the waters and incur a liability for Almon Realty, for Creekside or for myself. [I did] not want to have them involved with any of the sales, any of the negotiations or any part of this deal." CP at 191-92.

¶10 Later the same day, Mr. Pauling was told by one of the Eastmans' real estate agents that Dr. Eastman had learned of the potential availability of the Young home from Dr. Place, not from the Rockwells, and that it had come to Dr. Place's attention through Prudential's sign and brochure. Mr. Pauling placed further calls to Dr. Young and the two were able to speak again on February 4; Mr. Pauling told Dr. Young what he had learned and asserted that a commission was owed. Dr. Young responded that he had now discussed the circumstances with Dr. Tom Eastman

three times, specifically questioning him about how he obtained knowledge of the Youngs' property, and it "seemed to be very clear" that the Eastmans' knowledge came from the Rockwells. CP at 194. Dr. Young said, "We told [Linda Rockwell that the home] wasn't for sale but she's a neighbor and these were friends so that we might consider showing it to them but I wasn't sure that we wanted to even sell it at that point." CP at 194. Dr. Young again disavowed liability for a commission.

¶11 A final exchange between Mr. Pauling and Dr. Young occurred through correspondence in March. In his final disavowal of liability for a commission, Dr. Young stated, in part:

> I questioned the origins of the Eastman's [sic] knowledge of our home very specifically on two separate occasions. I was assured without any doubt that that [sic] they did not come to knowledge of our home *directly or indirectly* through any efforts of Prudential Almon Realty. This was later confirmed in a separate independent conversation with Dr. and Mrs. Rockwell.

> I discussed with you and Meg Irwin the conclusion of these findings. After that meeting you called me and indicated that you wanted to pursue further. I contacted Tom Eastman yet a third time and was told again that without any doubt they did not come to knowledge of our home, *directly or indirectly*, through any efforts of Prudential Almon Realty.

CP at 175 (emphasis added). In addition to Dr. Young's statement in the letter that he had explored the Eastmans' direct and indirect sources of knowledge, he later testified that in concluding that a commission was not owed, he was satisfied that the sale of his home "did not happen through the efforts, direct or indirect, of Prudential Almon." CP at 192.

¶12 The sale of the property from the Youngs to the Eastmans closed in March. The Eastmans eventually paid Creekside $5,000, believing, according to Dr. Eastman, that "[w]e felt that they deserved some reimbursement. We had no idea of what Kipp's intentions were." CP at 238.

¶13 Prudential thereafter brought this action against the Youngs. In deposition discovery, Dr. Eastman testified, in part:

Q. . . . Dr. Eastman, had it not been for your brother pointing out 610 Noble Hill to you, do you believe that you and your husband would have purchased that property?

A. Well, we had no knowledge that it was still on the market. He is the one that brought it up as a potential property.

CP at 239.

¶14 Dr. Place testified, in part:

Q. Okay. If there wasn't a Prudential sign back in 2008, would you have known that that property was for sale?

A. No.

CP at 210.

¶15 The parties eventually filed cross motions for summary judgment. The trial court denied Prudential's motion and granted summary judgment to the Youngs. In a letter to the parties announcing its decision, the court cited *Roger Crane & Associates v. Felice*, 74 Wn. App. 769, 875 P.2d 705 (1994) and *Lloyd Hammerstad, Inc. v. Saunders*, 6 Wn. App. 633, 495 P.2d 349 (1972) as involving distinguishable facts but a controlling rationale, concluding:

Both cases stand for the proposition that there must be some minimal causal relationship between the action of the broker during the listing period and the ultimate sale. In the instant case, except for the signage, which had been removed, and the flyer, of which the Eastman[ ]s were unaware, plaintiff did nothing with the present purchasers. The procuring cause consisted of the efforts of Dr. Place and Ms. Rockwell. In the view of the court, although there may have been some causal relationship, the efforts of the Plaintiff were less than minimal.

CP at 304. The court denied Prudential's motion for summary judgment, granted the Youngs' motion, and awarded them fees and costs on the basis of the attorney fee provision in the listing agreement. This appeal followed.

## ANALYSIS

¶16 Prudential makes three assignments of error. It contends that the trial court erred (1) by concluding as a matter of law that Prudential was not the procuring cause of the sale, (2) by finding that Prudential's efforts were "less than minimal," and (3) by concluding as a matter of law that Prudential was not entitled to a commission pursuant to the terms of the listing agreement.

¶17 On review of summary judgment, we engage in the same inquiry as the trial court. *Vallandigham v. Clover Park Sch. Dist. No. 400*, 154 Wn.2d 16, 26, 109 P.3d 805 (2005). Summary judgment is affirmed if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). All facts are considered in the light most favorable to the nonmoving party, and summary judgment is granted only if, from all of the evidence, reasonable persons could reach but one conclusion. *Vallandigham*, 154 Wn.2d at 26. The burden is on the moving party to show that there is no genuine issue as to any material fact. *Id.*

I

¶18 Prudential argues first that the trial court erred in concluding as a matter of law that it was not the procuring cause of the Youngs' sale to the Eastmans. Under the procuring cause of sale doctrine, when a party is employed to procure a purchaser and does procure a purchaser to whom a sale is eventually made, that party is entitled to a commission regardless of who makes the sale. *Prof'ls 100 v. Prestige Realty, Inc.*, 80 Wn. App. 833, 836-37, 911 P.2d 1358 (1996) (citing *Willis v. Champlain Cable Corp.*, 109 Wn.2d 747, 754, 748 P.2d 621 (1988) (citing *Feeley v. Mullikin*, 44 Wn.2d 680, 683, 269 P.2d 828 (1954))).

A broker is a procuring cause of a sale if it sets in motion a series of events culminating in the sale and, in doing so, accomplishes what the broker undertook under the agreement. *Roger Crane*, 74 Wn. App. at 776 (quoting *Bonanza Real Estate, Inc. v. Crouch*, 10 Wn. App. 380, 385, 517 P.2d 1371 (1974)). The doctrine provides a default standard for liability to pay a commission where the parties have not agreed on a different standard, or where the parties' agreement as to when a commission will be paid proves ineffective. *See Willis*, 109 Wn.2d at 755. In cases where the parties' contract includes a standard for liability for a commission that is consistent with the concept of procuring cause of sale, case law dealing with the procuring cause standard applies. *Prof'ls 100*, 80 Wn. App. at 837-38. But a contract can provide for payment of commissions to a broker for being something less than the procuring cause of sale, and when it does, the terms of the contract control unless the contract is ineffective. *Id.*; *and see Clients' Serv., Inc. v. Pupo*, 71 Wn.2d 610, 615, 430 P.2d 552 (1967) (whether the broker must have been the procuring cause of the sale in order to be entitled to commission depends on the language of the broker's agreement).

¶19 The terms under which Prudential was entitled to a commission *during* the term of its listing agreement with the Youngs included instances consistent with the concept of procuring cause of sale. But the tail provision in this case is not couched in procuring cause terms. It provides:

> If the property or any portion thereof or any interest therein is, directly or indirectly, sold, exchanged, leased or is purchased under an option, within 365 days after the expiration of this Agreement to any person with whom a Broker negotiated or to whose attention the Property was brought through the signs, advertising, or any other action or effort of a Broker, Broker's agents, employees or subagents, or on information secured directly or indirectly from or through a Broker during the term of this Agreement, then Seller shall pay Broker the above compensation.

CP at 37, ¶ 8(a). Because the Eastmans' offer and the sale of the Youngs' home occurred after the listing agreement expired, it is the tail provision of the listing agreement that controls. Prudential is entitled to a commission only if the conditions of the tail provision, not the procuring cause doctrine, are satisfied.

## II

■ ■ ¶20 Prudential next challenges the trial court's determination, as a matter of law, that Prudential's efforts were less than minimal. The requirement that there be some minimal causal relationship between a broker's activities during the listing period and a sale following its expiration in order for a commission to be owed was first recognized in *Lloyd Hammerstad*, 6 Wn. App. at 636. In stating the requirement, *Lloyd Hammerstad* cited to *Korstad v. Hoffman*, 221 Cal. App. 2d Supp. 805, 35 Cal. Rptr. 61 (1963) as analogous and supportive of the requirement.

¶21 In *Korstad*, the defendant, Mr. Hoffman, entered into a 60-day exclusive listing agreement with Korstad & Elliott Realty. The agreement disclosed that Korstad & Elliott, referred to in the agreement as the "Agent," would refer its listing of the Hoffman property to members of the local realty association, whom the agreement referred to as "listing associates." The agreement provided that the exclusive right to sell the property was being granted to "said Agent and/or listing associates," and provided, in part, that if the property was sold during the tail period "to any party to whom said Agent or listing associates introduced the property during the listing period, I hereby agree to pay said Agent and/or listing associates the commission." 221 Cal. App. 2d Supp. at 807. During the listing period a salesman employed by Siegel Realty Inc. introduced the property to a couple who later purchased it, after the expiration of the listing but during the tail period. Korstad & Elliott Realty sued for the commission.

¶22 The court's principal quandary in interpreting the listing agreement was ambiguity over the respective rights to a commission of the "Agent and/or listing associates." As the court explained:

> We have, therefore, language by which the owner may become liable to pay a commission either (1) to the agent, or (2) to the agent and listing associates, or (3) to the listing associates. This fact becomes of considerable importance in determining what is meant by the use of the word "introduced." It is apparent that the parties contemplate that there may be some circumstances under which the owner becomes liable to pay a commission to the broker. It also is apparent that the parties contemplate that there may be circumstances or conditions under which a commission is payable to a listing associate. The Court is bound to construe a contract in such manner that it will be reasonable, if that is possible. It becomes apparent, therefore, that the act of the salesman or broker by which he "introduced" the property to the prospective purchaser must have had at least some connection with the sale ultimately consummated.

*Id.* at 809. Given that construction, the court concluded:

> Under the terms of the contract, if there was any liability to pay a commission it would be to Siegel Realty, Inc., or to [its salesman] in case the acts of [the salesman] had had anything to do with the sale, but in any event the record is clear to the effect that [Messrs. Korstad and Elliott] had nothing whatever to do with it.

*Id.* at 810. The court, therefore, remanded with directions to enter judgment in favor of Mr. Hoffman.

¶23 In *Lloyd Hammerstad*, the defendant, Ms. Saunders, entered into a sales agency contract with the Lloyd Hammerstad agency, granting it a 1-month exclusive listing and a 12-month tail provision. The agreement required payment of a commission for a sale consummated during the tail period if

> "said property, or any part thereof, is sold or exchanged within twelve (12) months after the expiration hereof to any person to

whom you, or any member or salesman of 'Multiple', or any person authorized by such member or salesman have previously offered it, or with whom you have negotiated or who has learned through you or your advertisements, directly or indirectly, that the property was for sale."

6 Wn. App. at 634. In the first month of the listing agreement, a member of the MLS showed dozens of homes to Dr. Phillip Ricker, who, upon being driven by Ms. Saunders' home, rejected it as too expensive, and shortly thereafter cancelled an appointment the member had made for him to see the home. That was the sum total of the doctor's contact with the property. A couple of months after expiration of the agency agreement, Dr. Ricker's wife, unaware that the home had been shown to her husband, accompanied a friend on a social visit to Ms. Saunders' home and learned that it was for sale. Based on Ms. Ricker's interest, negotiations were pursued and the Rickers purchased the home. Lloyd Hammerstad claimed entitlement to its commission on a basis akin to that relied upon by Korstad & Elliott Realty in the *Korstad* case: that the MLS member engaged by Dr. Ricker several months before Ms. Ricker saw the property "offered it" to him within the meaning of the tail provision. Notably, Lloyd Hammerstad did not contend that its advertising brought the property to the Rickers' attention.

¶24 *Lloyd Hammerstad* held that "some minimal causal relationship between the activities of the broker during the listing period and the ultimate sale" is implicit in the purpose of a tail provision. 6 Wn. App. at 636. There was no need to elaborate in the opinion on the meaning of "some minimal causal relationship" (a term never mentioned in *Korstad*) because in *Lloyd Hammerstad* the court found literally *no* connection between the broker's activities and the sale.

¶25 Decisions since *Lloyd Hammerstad* have not provided further guidance on the required "minimal causal relationship" when a broker claims entitlement to a com-

mission under a tail provision. In *Korstad*, the need for a causal relationship was read into the agreement to resolve what would otherwise be ambiguity over whether the listing agent, the selling agent, or both were entitled to be paid. In *Lloyd Hammerstad*, the court also implied a minimal causation requirement as part of a rational reading of the agency agreement, in order to distinguish those cases where there is some causal connection between a broker's or agent's activities and an eventual sale and those cases where a sale is truly fortuitous, having no connection to a broker's activities.

¶26 In this case, the trial court's letter ruling acknowledged that "[i]n the view of the court . . . there may have been some causal relationship" between Prudential's signs and advertising and the Eastmans' purchase of the home. CP at 304. Viewing the evidence in the light most favorable to Prudential, there was a causal relationship: the fact that Dr. Place had seen the sign and brochure and encouraged Dr. Eastman's interest in the property was the reason Dr. Eastman asked her agents about the property, the reason she drove by to see it, the reason she stopped at the Rockwell home to get a closer look, and the reason she and Dr. Place pursued information on whether it was still for sale. That should have been the end of the *Lloyd Hammerstad* "some minimal causal relationship" analysis.

¶27 The trial court also erred in relying on the rationale of *Roger Crane*, as urged by the Youngs. *Roger Crane* turned on the application of the procuring cause doctrine, not the language of the tail agreement. 74 Wn. App. at 775 ("The language of the tail is not at issue here; this property was sold well within the effective dates of the listing agreement. Mr. Brooks must therefore be the procuring cause of this sale to qualify for the commission.").

## III

¶28 Prudential finally assigns error to the court's conclusion as a matter of law that it was not entitled to a

commission pursuant to the terms of the listing agreement. In moving for summary judgment, the Youngs argued that there was no genuine issue of fact that the conditions under which a tail commission is payable exist in this case in light of their reading of *Lloyd Hammerstad* and *Roger Crane*, which they argued control. The gist of their argument was that Prudential had demonstrated "a less compelling connection to the subject sale" than had the brokers in *Lloyd Hammerstad* and *Roger Crane* because it had no direct dealings with the Eastmans. CP at 98. Their argument focused on contrasting the number and nature of direct broker-to-buyer dealings in *Lloyd Hammerstad* (two) and *Roger Crane* (one or two) with the number in this case (none).

¶29 To begin with, *Lloyd Hammerstad* and *Roger Crane* were both commission claims asserted by selling brokers, not listing brokers. Since the adoption of chapter 18.86 RCW (real estate brokerage relationships) in 1996, the selling broker through a multiple listing agency (in this case, Creekside) is an agent of only the buyer in the ordinary transaction; the buyer's agent is "to make a good faith and continuous effort to find a property for the buyer." RCW 18.86.050(1)(e); *see* RCW 18.86.010(5). If a selling broker has any involvement with a property at all, it will be direct involvement with the buyer. By contrast, the listing broker, which was Prudential's role here, is exclusively the seller's agent, whose duty is "to make a good faith and continuous effort to find a buyer." RCW 18.86.040(1)(e); *see* RCW 18.86.010(14). As pointed out by amicus Washington Realtors, not only is it common for a listing broker to have no contact with a buyer, such contact is generally a breach of the Realtor's Code of Ethics. Br. of Amicus Curiae at 9-10. The fact that Prudential cannot point to direct contacts with the buyer therefore does not establish that it did not fulfill its role; it reflects the fact that it had a

different role.[2] This is particularly true where, as here, the Youngs refused to allow Prudential to become involved and perform the duties it would ordinarily have performed upon and following receipt of the Eastmans' offer.

¶30 Next, much of the Youngs' argument on appeal dwells on Prudential's alleged failure to demonstrate that it was the procuring cause of the sale. Br. of Resp'ts at 13-20. We have already determined that the tail provision is not consistent with the procuring cause standard, which is therefore irrelevant. The Youngs also rely on their contention that as a matter of law, there was no minimal causal connection between Prudential's activity during the term of the listing agreement and the later sale. We have already determined that viewed in the light most favorable to Prudential, the evidence demonstrates the required causal connection.

¶31 Because the foregoing arguments fail, the propriety of the trial court's summary judgment dismissal turns on whether the Youngs demonstrated that there was no genuine issue of material fact that Prudential failed to satisfy the conditions of the tail provision. Here, the Youngs' brief relies on its argument that the language "to any person . . . to whose attention the Property was brought through the signs, advertising, or any other action or effort of [Prudential]" should be read to mean that the buyer's attention must have been brought to the property *directly* through the signs, advertising, or any other action or effort of Prudential—and it is undisputed that the Eastmans' knowledge of Prudential's signs and advertising was indirect.

¶32 Prudential points out, and the Youngs do not disagree, that courts give undefined terms their plain, ordinary, and popular meaning, and that *Webster's Dictionary*

---

[2] Prudential filed declarations establishing that it performed its duty not only by erecting its sign, creating the marketing brochure picked up by Dr. Place, and preparing the listing information later accessed by Creekside agents, but also by hosting catered open houses, running advertisements in newspapers and real estate guides, and fielding three serious offers during the listing term. CP at 101-04.

defines "through" as meaning "because of." Br. of Appellant at 10. Prudential also points out that Dr. Young indicated in correspondence and in deposition testimony that he understood that he owed Prudential a commission if Prudential's efforts even *indirectly* resulted in the sale. *Id.* (citing CP at 191:3, 196, ¶ 5). The tail provision does not state that the buyer's attention must be attracted "directly" by Prudential's sign or advertising, and elsewhere the listing agreement clearly contemplates that buyers may use agents. *E.g.*, CP at 36-37, ¶ 5(b) (lockbox may be used by buyers' agents), 5(e) (broker procuring a prospective purchaser will ordinarily not be representing the seller and may represent the buyer), 5(f) (outlining possible dual agency situations, in which there could be common representation of seller and buyer).

¶33 The Youngs argue that the use of the qualifier "directly or indirectly" elsewhere in the agreement implies that the tail contingency requires a direct connection, but "directly or indirectly" appears only three places in the three-page, single-spaced listing agreement. The inference urged by the Youngs is doubtful where most of the terms dealing with action or events that could be related directly or indirectly are silent as to a required or permitted connection—suggesting that the drafter might simply have thought the better of including dozens of "directly or indirectlys" in the agreement. Finally, the Youngs have suggested no reason why, upon entering into the listing agreement, the parties would have intended a different result depending on whether the attention of a buyer was drawn to the property directly or through others who were looking at properties on the buyer's behalf; both the effort on the part of Prudential and the benefit to be derived by the Youngs would be the same, regardless. *Cf. Clients' Serv.*, 71 Wn.2d at 615-16 (rejecting argument that in order to *literally* entitle the broker to a commission under the tail provision, the property must have been offered to the same individual or legal entity that ultimately purchased; the

owner could identify no substantive significance that would warrant such a literal interpretation). While the Youngs suggest that we should construe the listing agreement against Prudential and on that basis interpret it in the manner they suggest, a reviewing court should not resort to the rule of interpretation that construes an agreement against its drafter unless the intent of the parties cannot otherwise be determined; "[the] primary goal in interpreting a contract is to ascertain the parties' intent." *Paradise Orchards Gen. P'ship v. Fearing*, 122 Wn. App. 507, 516, 94 P.3d 372 (2004), *review denied*, 153 Wn.2d 1027 (2005).

¶34 *Berg v. Hudesman*, 115 Wn.2d 657, 667-68, 801 P.2d 222 (1990) adopted the interpretation process as the framework by which we analyze contract issues, holding that extrinsic evidence is admissible as to the entire circumstances under which a contract was made, as an aid in ascertaining the parties' intent and regardless of whether the contract language is deemed ambiguous. In so doing, it adopted *Restatement (Second) of Contracts* § 212(2) (1981), which provides, in part, that "[a] question of interpretation of an integrated agreement is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence." *See Berg*, 115 Wn.2d at 667-68.

¶35 In this case, both the disputed facts and the choice among reasonable inferences to be drawn from the evidence make this a claim that cannot be resolved as a matter of law on the bases urged by the Youngs.[3] Summary judgment was inappropriate.

---

[3] In oral argument, the Youngs urged us to affirm the grant of summary judgment in their favor on alternative grounds, arguing that their sale of the property was not "to" the person to whose attention the property was brought through Prudential's signs, advertising, or other actions or efforts, nor, they contend, was attention drawn "during the term of this Agreement." These arguments were not made in the trial court or in the Youngs' appellate briefing, nor, as a result, were they addressed in Prudential's reply. We will not decide a case on the basis of issues that were not set forth in the parties' briefs. RAP 12.1; *State v. Johnson*, 119 Wn.2d 167, 171, 829 P.2d 1082 (1992).

¶36 Both parties request an award of attorney fees under ¶ 14 of the listing agreement, which provides that in the event of a dispute, the prevailing party shall be entitled to reasonable attorney fees and costs, including those for appeals. Because any award of fees to the prevailing party must await the final outcome of the parties' dispute, both parties' requests are denied.

¶37 Reversed and remanded.

SWEENEY and BROWN, JJ., concur.