# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 55944-7-II |
| Respondent, | |
| v. | |
| CHARLES GERARD HOLMES, | UNPUBLISHED OPINION |
| Appellant. | |

PRICE, J. — Charles Holmes appeals from his convictions of one count of first degree burglary and two counts of first degree robbery along with deadly weapon enhancements for each of the convictions. He asserts: (1) the trial court erred in not giving the jury a unanimity instruction for the deadly weapon enhancements, (2) the State presented insufficient evidence to convict him of first degree robbery, (3) the prosecutor's statements regarding witness credibility were misconduct, (4) defense counsel was ineffective for failing to object to the prosecutor's statements during closing argument, (5) the trial court erred in imposing discretionary legal financial obligations (LFOs), and (6) the trial court erred in imposing community custody supervision fees. We determine that Holmes' arguments fail, except that we remand for the trial court to strike the discretionary LFOs imposed.

FACTS

## I. Background

In February 2020, Holmes and Sambeth (Sam) Loeung, with the aid of Angela Rothschiller and Michelle Rothschiller, broke into a trailer owned by Tina Pase. Holmes and Loeung entered the trailer with fake guns while Angela and Michelle waited in a car, listening to the police scanner.[1]

The four individuals believed Pase was selling drugs out of the trailer, and they planned to rob her of the drugs. All four were under the influence of drugs at the time of the incident.

Once inside the trailer, Holmes and Loeung threatened Pase and her boyfriend, David Miller, demanding drugs. Shortly after Holmes and Loeung entered the trailer, police arrived and arrested Holmes, along with Angela and Michelle. Loeung fled the scene of the crime but was later arrested by police.

The State charged Holmes with one count of first degree burglary, two counts of first degree robbery, and one count of theft in the second degree along with deadly weapon enhancements for each charge. The State struck deals with both Angela and Michelle for reduced charges in exchange for their testimony against Holmes.

## II. Trial

### A. Testimony

The case proceeded to a jury trial. Angela and Michelle both testified. Angela testified that on the way to the trailer, she stopped the car, and Holmes opened the trunk and pulled out the

---

[1] Because Angela and Michelle share the same last name and to avoid confusion, we refer to them using their first names. No disrespect is intended.

"fake guns." 1 Verbatim Report of Proceedings (VRP) (June 9, 2021) at 150. Holmes then got back into the car and handed a gun to Loeung. Michelle testified that she had not seen anything that looked like a gun prior to the incident.

Pase testified that Holmes and Loeung entered her trailer in the middle of the night while she was in bed. Miller got out of bed, and then Pase heard yelling, screaming, and a loud bang from the other side of the trailer. Pase called 911. Soon thereafter, Holmes came into Pase's bedroom and threated her with what appeared to be a gun or a stick while screaming, "Where's the drugs or I'm going to blow your head off. Tell me where the drugs are." 1 VRP (June 10, 2021) at 380.

Holmes grabbed Pase by the face and pulled her out of bed while continuing to scream and ask her where the drugs were. When asked if it hurt when Holmes grabbed and pulled her by her face, she responded, "Yeah. I think it scared me more, you know; you focus more on the fear than the pain." 1 VRP (June 10, 2021) at 382. Holmes ordered Pase to go to the other end of the trailer where Miller was lying on the ground with his hands zip-tied.

Pase also testified that, at some point during the robbery, Holmes picked up an axe that was in the trailer and threatened to chop off her toes.

B. CLOSING ARGUMENT

During its closing argument, the State commented on the credibility of both Michelle and Angela. The State said,

> I could talk about the credibility of Michelle. To be perfectly honest, I think Michelle was covering for Sam. And you can understand why. I totally understand why. But, you know, we're trying to figure out the truth so we made a deal with them. And the same thing with Angela; I don't think she was covering for anybody; she gave it all up. The State believes she told you what she remembers.

3

2 VRP (June 11, 2021) at 90. But the State ended its comments with the following,

> Of course, you have to take that with a grain of salt because everybody was high. Everybody was high.

2 VRP (June 11, 2021) at 90. Defense counsel did not object to these statements.

There was evidence a BB gun was used, but no evidence was admitted at trial about the characteristics or capabilities of BB guns. However, the State said the following about BB guns in its closing argument:

> So, what can a BB gun do to your body? Most people, depending on your age, a lot of them are either outlawed or have a thing at the end of them. What can a BB gun do to your body? Especially one that you can pump. I don't know how many of you are familiar with pump BB guns. Typically the more you pump it the more powerful it becomes, and the BB travels at a higher velocity. But, I've been shot with a BB gun. You know, I think most folks -- maybe/maybe not -- I grew up in Alaska so I was abused as a child -- but, I'm sure some of you have probably experienced the very same thing. But most of us think of it, it hits you in your rear end or something like that, not that it's going to cause that much damage; but, what if it hits you in the eye? Is it going to cause substantial loss or impairment of the function of any bodily part? Maybe sight. Of course.
>
> So the State would submit that a BB gun is a deadly weapon and can cause substantial bodily harm.

2 VRP (June 11, 2021) at 52-53. Defense counsel did not object to these statements.

C. JURY INSTRUCTIONS AND VERDICT

The jury instructions included a special verdict form for a deadly weapon enhancement for the charges. Both the State and Holmes proposed a jury instruction for the deadly weapon enhancement special verdict that included the definition of a deadly weapon when used as an element of a crime. Neither party proposed an instruction that included a unanimity requirement for the deadly weapon enhancement.

The State did not make an election regarding the specific instrument, the axe or the BB gun, on which it was relying. Rather, the State argued that both could be considered deadly weapons, indicating the jury could rely on either to find the enhancement:

> The State would submit to you that in this particular case there's no ax on [the list of examples of deadly weapons]. That doesn't mean it's not a deadly weapon. There's no BB gun on there; that doesn't mean it's not a deadly weapon . . . .

2 VRP (June 11, 2021) at 62.

The trial court did not instruct the jury that it must unanimously decide that Holmes was armed with a specific weapon, either the axe or the BB gun, in order to agree on the deadly weapon enhancement.

The trial court instructed the jury that the arguments of the attorneys were not evidence and to "disregard any remark, statement, or argument that is not supported by the evidence or the law . . . ." Clerk's Papers (CP) at 258. The trial court also instructed the jury that it was the sole judge as to the credibility of each of the witnesses.

The jury found Holmes guilty of all of the charges, except for theft in the second degree. The jury also unanimously agreed to the deadly weapon enhancements for each of the charges of which Holmes was found guilty.

### III. SENTENCING

At sentencing, defense counsel argued for a lower sentence by explaining that Holmes had been able to maintain employment in the past when he had not been in custody and if he had been acquitted, his employer would have hired him back. Defense counsel also noted that Holmes had three children, including one who was still a minor.

The trial court imposed a sentence of 102 months for the first degree burglary conviction and 144 months for the two first degree robbery convictions. Each conviction included a 24 month deadly weapon enhancement. In total, the trial court sentenced Holmes to 216 months in prison. The trial court also imposed 18 months of community custody for each of the counts.

Regarding fees, the trial court did not ask any questions of Holmes or his attorney about Holmes' financial situation. But it did reference defense counsel's earlier statements made in the course of arguing for a lower sentence:

> I find that [Holmes] does, based on his work history and the fact that he had a job waiting for him, he does have the ability to pay legal financial obligations. He only has one current dependency on his three children. And all the -- taking all the things into consideration that I would, I find that he does have the ability to pay legal financial obligations.

2 VRP (June 16, 2021) at 115. Thereafter, the trial court imposed LFOs on Holmes, including a $500 crime victim assessment fee, a $200 criminal filing fee, and $2,500 in attorney fees. The trial court also ordered that Holmes pay community custody supervision fees.

Holmes appeals both his convictions and his sentence.

ANALYSIS

I. UNANIMITY

Holmes argues that his right to a unanimous jury verdict was violated because the jury did not receive a unanimity instruction regarding the deadly weapon enhancements and the State did not make an election about a specific weapon during closing argument. We disagree.

A. LEGAL PRINCIPLES

    1. Invited Error

The invited error doctrine precludes review of an error the defendant invited below, even if the error is one of constitutional rights. *State v. Studd*, 137 Wn.2d 533, 546-47, 973 P.2d 1049 (1999); *State v. Henderson*, 114 Wn.2d 867, 870-71, 792 P.2d 514 (1990). Invited error applies where a party proposes an instruction that does not include a unanimity requirement and then complains on appeal that a unanimity requirement should have been included. *State v. Corbett*, 158 Wn. App. 576, 592, 242 P.3d 52 (2010).

    2. Unanimity

Criminal defendants have a right to a unanimous jury verdict found in the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution. *Ramos v. Louisiana*, ___ U.S. ___, 140 S. Ct. 1390, 1397, 206 L. Ed. 2d 583 (2020); *State v. Armstrong*, 188 Wn.2d 333, 340, 394 P.3d 373 (2017). Criminal defendants may be convicted only if a jury unanimously determines the defendant committed the criminal act with which they were charged. *State v. Petrich*, 101 Wn.2d 566, 569, 683 P.2d 173 (1984), *abrogated on other grounds by State v. Kitchen*, 110 Wn.2d 403, 756 P.2d 105 (1988).

"When the prosecution presents evidence of several acts that could form the basis of one count charged, either the State must tell the jury which act to rely on in its deliberations or the court must instruct the jury to agree on a specific criminal act." *Kitchen*, 110 Wn.2d at 409, *abrogated on other grounds by In re Pers. Restraint of Stockwell*, 179 Wn.2d 588, 316 P.3d 1007 (2014). This is done through a *Petrich* instruction, which is designed to prevent confusion because where such an instruction is necessary, but not given, "some jurors may have relied on one act or

7

incident and some another, resulting in a lack of unanimity on all of the elements necessary for a valid conviction." *Id.* at 411.

We review constitutional issues de novo. *State v. Jorgenson*, 179 Wn.2d 145, 150, 312 P.3d 960 (2013).

B. APPLICATION

Holmes argues that his right to a unanimous jury verdict was violated by the deadly weapon enhancements. He asserts that the jury was not instructed that it must be unanimous as to the specific deadly weapon for the enhancements, and the State failed to make an election. We disagree.

1. Invited Error

Holmes proposed, in part, the deadly weapon enhancement jury instruction used by the trial court that did not include a unanimity instruction. By specifically proposing this instruction, Holmes invited the error about which he now complains and, accordingly, his argument fails. *Corbett*, 158 Wn. App. at 592.

2. Unanimity

Even if the absence of a unanimity instruction for the firearm enhancements was not invited by Holmes, his argument still fails because such an instruction is not required. Holmes does not cite any Washington cases that hold the jury must be unanimous as to the specific weapon used for a deadly weapon enhancement, and we have found none. Both parties also recognize that no published Washington decisions address this issue. Of the few unreported decisions of this court

on this issue,[2] each has found that firearm and deadly weapon enhancements do not implicate jury unanimity concerns as to the specific firearm or deadly weapon allegedly used. *See State v. Benitez*, noted at 172 Wn. App. 1018, 2012 WL 6098271, *review denied*, 117 Wn.2d 1003 (2013); *State v. Oeung*, No. 46425-0-II (Wash. Ct. App. Sept. 27, 2016) (unpublished), *review denied*, 187 Wn.2d 1015 (2017).[3]

For example, in *Benitez*, the defendant was arrested in the presence of multiple firearms, and he argued that his constitutional right to a unanimous jury verdict was violated because the jury was not instructed to agree on the specific gun it thought he was armed with for the purposes of firearm enhancements. Division One of this court disagreed, stating:

> Benitez fails to cite to any authority suggesting how the general jury unanimity analysis applies to a firearm enhancement, which is not an independent crime. The firearm and deadly weapon enhancement statutes do not provide that the State must specify which weapon it is relying on. RCW 9.94A.533, .825. And, Benitez similarly fails to cite to relevant authority suggesting that a jury must be unanimous as to the specific weapon used when returning a firearm or deadly weapon special verdict. The trial court was not required to provide a unanimity instruction for the firearm enhancement.

*Benitez*, 2012 WL 6098271, at *8.

Moreover, if general jury unanimity analysis is applied to enhancements, the analysis results in no unanimity being required as to the specific weapon used to support the enhancement. The deadly weapon enhancement statute lists multiple instruments that qualify as deadly weapons:

> Blackjack, sling shot, billy, sand club, sandbag, metal knuckles, any dirk, dagger, pistol, revolver, or any other firearm, any knife having a blade longer than three inches, any razor with an unguarded blade, any metal pipe or bar used or intended to be used as a club, any explosive, and any weapon containing poisonous or injurious gas.

---

[2] We cite to unpublished cases that are necessary for a reasoned decision. GR 14.1(c).

[3] https://www.courts.wa.gov/opinions/pdf/D2%2046425-0-II%20Unpublished%20Opinion.pdf.

RCW 9.94A.825. These instruments are analogous to "a 'means within a means' " in an alternative means crime. *State v. Jallow*, 16 Wn. App. 2d 625, 638, 482 P.3d 959 (2021) (quoting *State v. Smith*, 159 Wn.2d 778, 783, 154 P.3d 873 (2007)). "The alternative means analysis focuses on whether the statute describes the crime in terms of separate, distinct acts (alternative means) or in terms of closely related acts that are aspects of one type of conduct (not alternative means)." *State v. Roy*, 12 Wn. App. 2d 968, 974, 466 P.3d 1142, *review denied*, 196 Wn.2d 1004 (2020). If the statute is describing a "means within a means," no unanimity instruction is required. *Id.*

In the case of the deadly weapon enhancement statute, the listed instruments are "closely related" to one another and are all aspects of one type of thing—weapons; as such, they are not truly "separate and distinct." This makes them similar, conceptually, to statutes describing "means within means" and, accordingly, a unanimity instruction should not be required.

Here, the jury agreed unanimously that the deadly weapon enhancements were proven. Holmes points to no persuasive authority that this unanimity must extend to the specific weapon used when returning a deadly weapon special verdict. Simply put, the deadly weapon enhancement statute does not define an independent crime and does not provide that the State must specify the specific weapon on which it is relying.

Accordingly, we determine Holmes invited the error he now alleges on appeal, and even if he did not, the trial court did not err in not giving a unanimity instruction with regard to the deadly weapon enhancements.

## II. SUFFICIENCY OF THE EVIDENCE

Holmes argues that the State presented insufficient evidence to support his first degree robbery conviction related to Pase. We disagree.

### A. LEGAL PRINCIPLES

The State has the burden of proving every element of each charged offense beyond a reasonable doubt under the state and federal constitutions. *State v. Johnson*, 188 Wn.2d 742, 750, 399 P.3d 507 (2017). In reviewing claims for insufficient evidence, we consider " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Id.* at 751 (quoting *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980)).

A criminal statute that provides for multiple ways to prove that a defendant committed the crime is characterized as an alternative means crime. *State v. Barboza-Cortes*, 194 Wn.2d 639, 643, 451 P.3d 707 (2019). Alternative means crimes require an expression of jury unanimity as to which means the defendant used to commit the crime. *Id.* However, " 'an expression of jury unanimity is not required provided each alternative means presented to the jury is supported by sufficient evidence.' " *Id.* (quoting *State v. Sandholm*, 184 Wn.2d 726, 732, 364 P.3d 87 (2015)).

First degree robbery is an alternative means crime. *See In re Pers. Restraint of Brockie*, 178 Wn.2d 532, 538, 309 P.3d 498 (2013). A defendant may commit first degree robbery if they are armed with a deadly weapon, display what appears to be a firearm or deadly weapon, or inflict bodily injury—three alternative means for committing the crime. RCW 9A.56.200; *see Brockie*, 178 Wn.2d at 537. " 'Bodily injury'. . . means physical pain or injury, illness, or an impairment

of physical condition." RCW 9A.04.110(4)(a). Accordingly, each alternative means must be supported by sufficient evidence. *See Barboza-Cortes*, 194 Wn.2d at 643.

B. APPLICATION

Holmes argues the State was required to present evidence for each of the alternative means for the first degree robbery against Pase, including that Pase experienced bodily injury. Holmes contends that although Pase testified she was scared, being scared does not satisfy the first degree robbery requirement for bodily injury. Accordingly, Holmes claims that the State presented insufficient evidence to support the first degree robbery conviction. We disagree.

Holmes' view of Pase's testimony is too narrow. Pase, in fact, did testify that Holmes inflicted bodily injury. She testified that Holmes grabbed her face with his hands and that it hurt. This was evidence of "physical pain," as required for first degree robbery. RCW 9A.04.110(4)(a). Although Pase noted that it scared her more than it hurt, her emphasis on the emotional impact of Holmes' actions does not nullify her clear agreement, when asked, that she felt pain and that it hurt. Especially when viewed in a light most favorable to the State, a reasonable juror could have found beyond a reasonable doubt that Holmes inflicted physical pain on Pase. Thus, we determine that there was sufficient evidence for the first degree robbery conviction related to Pase.

III. PROSECUTORIAL MISCONDUCT

Holmes argues that the prosecutor committed misconduct during closing argument by giving their personal belief about the credibility of witnesses. We determine that, although the prosecutor did commit misconduct, there was no prejudice that could not have been cured by a jury instruction.

No. 55944-7-II

A. LEGAL PRINCIPLES

To prevail on a claim of prosecutorial misconduct, a defendant must first demonstrate that the prosecutor's statements were improper and, second, that they were prejudicial. *State v. Warren*, 165 Wn.2d 17, 26, 195 P.3d 940 (2008), *cert denied*, 556 U.S. 1192 (2009). "If the defendant proves the conduct was improper, the prosecutorial misconduct still does not constitute prejudicial error unless the appellate court determines there is a substantial likelihood the misconduct affected the jury's verdict." *State v. Stenson*, 132 Wn.2d 668, 718-19, 940 P.2d 1239 (1997), *cert denied*, 523 U.S. 1008 (1998).

Where a defendant fails to object to a prosecutor's statements at the trial court level, a waiver is presumed unless the defendant can show that the statements were so flagrant and ill-intentioned that no instruction could have cured them. *Warren*, 165 Wn.2d at 30.

"[A] prosecutor's expressions of personal opinion about the defendant's guilt or the witnesses' credibility are improper." *State v. Anderson*, 153 Wn. App. 417, 428, 220 P.3d 1273 (2009), *review denied*, 170 Wn.2d 1002 (2010). A prosecutor commits misconduct when they personally vouch for a witness' credibility. *Warren*, 165 Wn.2d at 30. "Improper vouching generally occurs (1) if the prosecutor expresses his or her personal belief as to the veracity of the witness or (2) if the prosecutor indicates that evidence not presented at trial supports the witness's testimony." *State v. Ish,* 170 Wn.2d 189, 196, 241 P.3d 389 (2010). However, a prosecutor "has wide latitude in closing argument to draw reasonable inferences from the evidence and may freely comment on witness credibility based on the evidence." *State v. Lewis*, 156 Wn. App. 230, 240, 233 P.3d 891 (2010).

13

B. APPLICATION

Holmes argues that the prosecutor made specific statements about the testimonies of both Michelle and Angela that violated the prohibition on vouching and impermissibly provided his personal opinion of their credibility. Specifically, Holmes points to the prosecutor's statements that included "I think Michelle was covering for Sam," "I don't think [Angela] was covering for anybody," and "[t]he State believes she told you what she remembers." 2 VRP (June 11, 2021) at 90.

Because the prosecutor injected his personal beliefs about these witnesses in these statements, they clearly constituted expressions of the prosecutor's personal opinion and, thereby, exceeded the wide latitude enjoyed by prosecutors to draw inferences and comment on credibility based on evidence. Thus, they were improper.

However, defense counsel did not object at the time of these comments. Holmes, therefore, must show the comments were so flagrant and ill-intentioned that a jury instruction could not have cured them. Viewed this way, the comments fall short of being incurable by an instruction. The prosecutor's statements were merely a few sentences. And the prosecutor minimized the reliability of all of the witnesses, including those for whom he was vouching, when he said,

> Of course, you have to take that with a grain of salt because everybody was high. Everybody was high.

2 VRP (June 11, 2021) at 90. Given this minimization, Holmes has not shown that this misconduct was so flagrant and ill-intentioned that an instruction from the trial court would not have cured any risk to the jury's consideration of the evidence.

Moreover, the trial court instructed the jurors that they were the sole judges of the credibility of each witness. We presume that the jurors followed this instruction and did not attribute importance to the prosecutor's improper remarks in light of how minimal they were. *See State v. Lamar*, 180 Wn.2d 576, 586, 327 P.3d 46 (2014) (" 'Juries are presumed to follow instructions absent evidence to the contrary.' " (quoting *State v. Dye*, 178 Wn.2d 541, 556, 309 P.3d 1192 (2013))).

Accordingly, we determine that Holmes' prosecutorial misconduct claim fails.

IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Holmes argues that defense counsel was ineffective for failing to object to the State's closing argument regarding the credibility of witnesses Angela and Michelle, as well as its closing argument regarding the capabilities of BB guns. We disagree.

A. LEGAL PRINCIPLES

The Sixth Amendment to the U.S. Constitution and article I, section 22 of the Washington Constitution guarantee a defendant the right to effective assistance of counsel. *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011), *cert denied*, 574 U.S. 860 (2014). Prevailing on an ineffective assistance of counsel claim requires the defendant to show: (1) deficient performance and (2) prejudice to the defendant. *Id.* at 32-33. A defendant who fails to show either prong fails to establish ineffective assistance of counsel. *Id.* at 33.

Counsel's performance is deficient if it falls below an objective standard of reasonableness. *Id.* We engage in a strong presumption that counsel's performance was reasonable. *Id.* A defendant may overcome this presumption by showing no " 'conceivable legitimate tactic

explaining counsel's performance.' " *Id.* (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)).

The prejudice prong requires the defendant to show "a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different." *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Grier*, 171 Wn.2d at 34 (quoting *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

Where a defendant's ineffective assistance of counsel claim is centered on defense counsel's failure to object, " '[o]nly in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal.' " *State v. Vasquez*, 198 Wn.2d 239, 248, 494 P.3d 424 (2021) (quoting *State v. Crow*, 8 Wn. App. 2d 480, 508, 438 P.3d 541 (2019)).

B. APPLICATION

1. Failure to Object to Prosecutor's Credibility Comments

In addition to his argument about prosecutorial misconduct for personal opinions on the credibility of Angela and Michelle, Holmes also argues that he received ineffective assistance of counsel when his defense counsel failed to object to these same comments by the prosecutor. As discussed above, the prosecutor's comments about his personal opinion about the credibility of Angela and Michelle were improper. However, for the same reasons that Holmes cannot show prosecutorial misconduct for these comments, he cannot show ineffective assistance of counsel— he cannot show prejudice.

Even if defense counsel was deficient for failing to object to these improper statements, Holmes has failed to establish a reasonable probability that, but for this failure, the results of the trial would have been different. Again, notwithstanding the fact that the prosecutor made statements like "I think Michelle was covering for Sam," "I don't think [Angela] was covering for anybody," and "[t]he State believes she told you what she remembers," the full context of the closing argument lessened the weight of the improper statements. Additionally, they were merely a few sentences during closing argument for a trial that spanned three days. Given the relatively minimal amount of time that the prosecutor devoted to these statements, their impact was likely negligible to the outcome of the trial.

Finally, again, the trial court instructed the jury that it was the sole judge of the credibility of each witness, and we presume that the jury followed that instruction. *See Lamar*, 180 Wn.2d at 586.

Thus, given his inability to show the results of the trial would have been different, Holmes' ineffective assistance of counsel claim related to the prosecutor's credibility comments fails.

2. Failure to Object to BB Gun Comments

Holmes also argues that defense counsel was ineffective for failing to object to the prosecutor's remarks in closing argument about the capabilities of the BB gun. We disagree.

At closing, the prosecutor offered his thoughts about BB guns that were not tied to evidence admitted at trial. In the course of arguing that a BB gun can constitute a deadly weapon, the prosecutor shared his own experience of being shot by a BB gun and said increasing the pressure in a BB gun by pumping it means the "BB travels at a higher velocity." 2 VRP (June 11, 2021) at 52-53.

17

The functioning and effect of pumping a BB gun and its relationship to the velocity of the BB is a fact likely outside of common knowledge. Because this fact was not admitted at trial, this comment constituted misconduct by the prosecutor. *Warren*, 165 Wn.2d at 29 (prosecutor commits misconduct when they refer to facts not in evidence during closing argument). But the portion outside common knowledge was narrow. In fact, most of what the prosecutor said was permissible argument using common public knowledge about BB guns. For example, the prosecutor also said:

> But most of us think of it, it hits you in your rear end or something like that, not that it's going to cause that much damage; but, what if it hits you in the eye? Is it going to cause substantial loss or impairment of the function of any bodily part? Maybe sight. Of course.

2 VRP (June 11, 2021) at 52-53.[4]

Focusing solely on the improper statements, Holmes must, again, show a reasonable probability that, but for the allegedly deficient performance, "the outcome of the proceedings would have been different." *Kyllo*, 166 Wn.2d at 862

Holmes cannot meet this burden. The jury was instructed that the statements by the attorneys were not evidence and it was to disregard any statement not supported by the evidence or the law. Juries are presumed to follow instructions. *See Lamar*, 180 Wn.2d at 586. Absent evidence to the contrary, we presume that the jury followed the instruction and properly disregarded the limited improper statements regarding the BB gun. Accordingly, we determine

---

[4] References to the fact that BB guns are capable of injuring eyes can be fairly characterized as common knowledge.

that Holmes' ineffective assistance of counsel argument with regard to the prosecutor's comments about the capabilities of the BB gun fails.[5]

## V. CRIMINAL FILING FEE AND ATTORNEY FEE RECOUPMENT

Holmes argues that the trial court erred in imposing mandatory and discretionary LFOs. The State concedes that the trial court erred. We accept the State's concession.

### A. LEGAL PRINCIPLES

Prior to imposing discretionary LFOs, a trial court must "consider the defendant's individual financial circumstances and make an individualized inquiry into the defendant's current and future ability to pay." *State v. Blazina*, 182 Wn.2d 827, 837, 344 P.3d 680 (2015). The record must reflect that such an inquiry has been made by the trial court. *Id.* at 838. Factors that trial courts should consider include "(1) employment history, (2) income, (3) assets and other financial resources, (4) monthly living expenses, and (5) other debts." *State v. Ramirez*, 191 Wn.2d 732, 744, 426 P.3d 714 (2018). "[T]he record must reflect that the trial court inquired into all five categories before deciding to impose discretionary costs." *Ramirez*, 191 Wn.2d at 744.

Under RCW 36.18.020(2)(h), a criminal filing fee may not be imposed on an indigent defendant, as defined by RCW 10.101.010(3)(a)-(c). A criminal defendant is indigent if they receive certain types of public assistance, are involuntarily committed to a public mental health

---

[5] It is unclear whether Holmes is also making a direct argument that the prosecutor's comments about BB guns is prosecutorial misconduct, as opposed to solely supporting his ineffective assistance of counsel argument. To the extent Holmes also contends these comments are misconduct, he cannot establish that they are so flagrant and ill-intentioned that a jury instruction could not have cured them.

facility, or receive an annual income of 125 percent less than the current federal poverty level. RCW 10.101.010(3)(a)-(c).

B. APPLICATION

Holmes argues that the trial court erred in imposing the criminal filing fee and the attorney fee recoupment despite the fact that Holmes was statutorily indigent.[6] The State concedes that Holmes was statutorily indigent, the trial court erred, and the fees must be reversed. We accept the State's concession and reverse.

VI. COMMUNITY CUSTODY SUPERVISION FEES

Holmes argues that the trial court erred in imposing community custody supervision fees on him as an indigent defendant.[7] We disagree.

A trial court cannot order an indigent defendant to pay costs. Former RCW 10.01.160(3) (2018).[8] "Costs" are defined as "expenses specially incurred by the state in prosecuting the defendant or in administering the deferred prosecution program under chapter 10.05 RCW or pretrial supervision." Former RCW 10.01.160(2).

---

[6] Holmes also argues that defense counsel was ineffective for failing to object to the criminal filing fee and attorney fee recoupment. Because we accept the State's concession that the trial court erred in imposing the fees, we do not address this issue.

[7] Holmes also argues that defense counsel was ineffective for failing to object to the trial court's imposition of community custody supervision fees. However, for the same reasons we determine that the trial court did not err in imposing the supervision fees, we also determine that Holmes has not established prejudice—because he has not shown a reasonable probability that, had defense counsel objected, the outcome would have been different.

[8] The legislature has amended the statutes at issue here since Holmes' sentencing. This opinion cites to the previous version of the provisions.

In addressing the issue of whether community custody supervision fees qualify as costs, we have previously held that, although community custody fees are discretionary LFOs, they do not qualify as "costs" under the statutory definition because "they are not an expense specially incurred by the State to prosecute the defendant, to administer a deferred prosecution program, or to administer pretrial supervision." *State v. Starr*, 16 Wn. App. 2d 106, 109, 479 P.3d 1209 (2021).

Consistent with *Starr*, we determine that the trial court did not err in imposing community custody supervision fees because they do not qualify as "costs" under the statutory definition.[9]

## CONCLUSION

The trial court erred in imposing mandatory and discretionary LFOs, but did not err in imposing community custody supervision fees. The remainder of Holmes' arguments fail. Accordingly, we affirm the convictions but remand to the trial court to strike the LFOs consistent with the State's concession.

---

[9] We acknowledge, however, that the imposition of LFOs on indigent defendants creates significant hardships and the legislature has amended the relevant statues since this sentencing. *See Blazina*, 182 Wn.2d at 835-37; RCW 9.94A.703(2). Therefore, the trial court on remand should reevaluate the imposition of the supervision fee. *State v. Spaulding*, 15 Wn. App. 2d 526, 537, 476 P.3d 205 (2020).

No. 55944-7-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

I concur:

GLASGOW, C.J.

LEE, J. (concurring) — The parties did not raise the issue of invited error in their briefing; therefore, the unanimity challenge should not be decided on the basis of invited error without the parties having had the opportunity to provide this court with their respective positions on the issue. RAP 12.1(a) ("[T]he appellate court will decide a case only on the basis of issues set forth by the parties in their briefs."); *Wash. Pro. Real Est., LLC v. Young*, 163 Wn. App. 800, 818, n.3, 260 P.3d 991 (2011) ("We will not decide a case on the basis of issues that were not set forth in the parties' briefs."), *review denied*, 173 Wn.2d 1017 (2012). To the extent the majority desired to decide this case on invited error, which neither party raised nor briefed, the majority should have allowed the parties the opportunity to present written argument on the issue of invited error. RAP 12.1(b); *State v. Johnson*, 119 Wn.2d 167, 171, 829 P.2d 1082 (1992) ("If a party has a meritorious argument, which has not been briefed, that is believed to be necessary to the resolution of the case, . . . we may consider the issue pursuant to RAP 12.1(b)."). Therefore, I respectfully disagree with the majority's reliance on invited error to resolve this appeal.

I agree, however, with the majority's "even if" analysis and conclusion that Charles G. Holmes' right to a unanimous jury verdict was not violated because deadly weapon enhancements do not require a jury unanimity instruction. I also agree with the remainder of the majority's opinion.



Lee, J.