[No. 32375-7-III.   Division Three.   October 6, 2015.]

WASHINGTON PROFESSIONAL REAL ESTATE, LLC, *Respondent*, v. KIPP YOUNG ET AL., *Appellants*.

*Daniel R. Case* (of *Larson Berg & Perkins PLLC*), for appellant.

*Amy L. Remy* (of *Finney, Falk & Remy PLLP*), for respondents.

¶1 SIDDOWAY, C.J. — This is the second time this dispute arising under an exclusive residential listing agreement between Dr. Kipp and Mrs. Carmen Young and Prudential Almon Realty has made its way to our court. Within five weeks after the expiration of the listing period under the agreement, the Youngs entered into a binding contract for the sale of their Yakima home to purchasers who Prudential claims learned of the home through its marketing efforts.

¶2 The trial court initially dismissed Prudential's claim for a commission under the "tail" provision of the listing agreement on summary judgment and awarded the Youngs contractual attorney fees. We concluded that the parties mistakenly relied on case law dealing with the common law concept of "procuring cause" rather than the tail provision of their own contract, which did not adopt a "procuring cause" approach. Unpersuaded by the Youngs' arguments that the tail provision supported their position as a matter of law, we found that disputed facts presented issues for the trier of fact. In a footnote, we observed that the Youngs raised new legal arguments at oral argument that we would not reach since the issues had not been raised in the trial

court or addressed in the Youngs' brief, and Prudential had not had an opportunity to respond. *Wash. Prof'l Real Estate, LLC v. Young*, 163 Wn. App. 800, 818 n.3, 260 P.3d 991 (2011) ("We will not decide a case on the basis of issues that were not set forth in the parties' briefs.").

¶3 Following remand, both parties renewed motions for summary judgment, which were denied, and the case proceeded to a bench trial. The trial court found for Prudential. The Youngs appeal.

¶4 We now conclude that the Youngs are entitled to judgment as a matter of law based on the legal arguments that were briefed and decided following the remand. We reverse the judgment in favor of Prudential and remand with instructions to enter judgment in favor of the Youngs.

## FACTS AND PROCEDURAL BACKGROUND

¶5 The following statement of facts that are most material to this appeal are based on the trial court's findings following the bench trial.

¶6 In May 2008, Dr. and Mrs. Young entered into a listing agreement with Prudential for the sale of their home in Yakima. The original six-month term of the listing ended on November 7, 2008, but the parties agreed to extend the term to December 31, 2008.

¶7 Meg Irwin, the listing broker, aggressively executed her responsibilities under the listing agreement. Among many other things, she caused a "For Sale" sign to be placed in the front yard of the Young property. She composed a flyer containing the details of the property and made copies available in a box attached to the "For Sale" sign.

¶8 Dr. John Rockwell and Linda Rockwell were next door neighbors to the Youngs. The Rockwells were friends of Dr. John Place, an orthopedic surgeon, and his wife, Mary. During the summer and fall of 2008, Dr. Place visited Dr. Rockwell at the Rockwell home to check on him following a surgery and Dr. and Mrs. Place also paid a social visit to the

Rockwell home. On these occasions, Dr. and Mrs. Place saw the Prudential "For Sale" sign in the Youngs' yard.

¶9 Dr. Place's sister, Dr. Pat Eastman, and her husband, Dr. Tom Eastman, were living in Nebraska in 2008 but were interested in relocating to Yakima, with the intention that Dr. Tom Eastman would join Dr. Place's medical practice. With that prospect in mind, Dr. Place looked for possible homes for the Eastmans and furnished information to his sister about homes that were for sale. In October 2008, Dr. Place was riding his motorcycle in the area of the Youngs' property, stopped at the property, and picked up one of the flyers. Although he took it home and showed it to his wife, he never provided it to the Eastmans.

¶10 In mid-January 2009, shortly before Dr. Pat Eastman would be traveling to Yakima to look at homes, Dr. Place e-mailed her either the address or the MLS (Multiple Listing Service) listing number for the Youngs' property. Upon receiving the e-mail, Dr. Eastman looked for information on the Youngs' property on the Internet but could not find any because the MLS posting had been removed after the listing agreement expired. Dr. Eastman also asked a real estate agent she had engaged, Sue Gifford, to provide her with information about the Youngs' property, but Ms. Gifford was unable to find any information either, for the same reason.

¶11 In anticipation of the Eastmans visiting Yakima in late January 2009, Ms. Gifford prepared a list of nine properties for them to visit. The Youngs' property was not included. On Saturday, January 24, Ms. Gifford drove Dr. Pat Eastman around to see the homes she had identified. Dr. Place accompanied them, and at one point, when they were in the vicinity of the Youngs' property, he suggested that they drive by it. They viewed the Youngs' home from the road. Although the "For Sale" sign was gone, Dr. Place told his sister he would inquire of the Rockwells whether the property was still for sale.

¶12 The next morning, after the Places had breakfast at a local restaurant with the Eastmans, the Places ran into the Rockwells outside the restaurant and asked if the Youngs' property was still for sale. The Rockwells did not know, but Mrs. Rockwell offered to contact the Youngs. She did, learned that it might be, and passed contact information for the Eastmans along to Dr. Young. Dr. Young then contacted the Eastmans to let them know that the home was off the market but that he and his wife might still be willing to sell it. Arrangements were made for the Eastmans to tour the property on two occasions in the following days. On January 28, the Eastmans made an offer to purchase. On or about January 29, the Eastmans reached an agreement to purchase the Young property.

¶13 Before the closing, Prudential learned of the pending sale and investigated whether a commission was owed under the listing agreement. It also offered to assist with the closing, but Dr. Young declined the help. Based on what its personnel learned about the Rockwell connection, Prudential initially concluded that a commission was *not* owed. But upon learning that Dr. Place had seen the "For Sale" sign and picked up a flyer, they concluded otherwise and demanded that the Youngs pay a $55,000 commission. The Youngs continued to disclaim liability for a commission, and this suit followed.

¶14 The tail provision of the parties' agreement provides:

If the property or any portion thereof or any interest therein is, directly or indirectly, sold, exchanged, leased or is purchased under an option, within 365 days after the expiration of this Agreement to any person with whom a Broker negotiated or to whose attention the Property was brought through the signs, advertising, or any other action or effort of a Broker, Broker's agents, employees or subagents, or on information secured directly or indirectly from or through a Broker during the term of this Agreement, then Seller shall pay Broker the above compensation.

Clerk's Papers (CP) at 8. Prudential's complaint and its trial brief contended that a commission was payable under the tail provision because the property had been sold, directly or indirectly, "to [a] person . . . to whose attention the Property was brought through the signs, advertising, or any other action or effort of . . . Broker's agents." CP at 5 (complaint, para. 4.2), 426 (trial brief).

¶15 Following the court's summary judgment in favor of the Youngs, our reversal, and the trial court's denial of renewed cross motions for summary judgment, the matter proceeded to a three-day bench trial. In a letter opinion that interpreted the listing agreement in favor of Prudential, the trial court reformatted the tail provision for purposes of its analysis, identifying three clauses (A, B, and C), as follows:

> If the property or any portion thereof or any interest therein is, directly or indirectly, sold, exchanged, leased or is purchased under an option, within 365 days after the expiration of this agreement to:
>
> A.   Any person with whom a Broker negotiated or,
> B.   (a buyer) to whose attention the Property was brought through the signs, advertising or, any other action or effort of a Broker, Broker's agents, employees, or subagents or,
> C.   (to a buyer based upon) information secured directly or indirectly from or through a Broker during the term of this agreement,
>
> Then Seller shall pay Broker the above compensation.

CP at 464.

¶16 The court then reasoned:

> Given the facts in our case as they apply to the outline above, the transaction between the Eastmans and the Youngs does not fit into "A" because [Prudential] did not negotiate with the Eastmans at any time.
>
> Section "B" does not fit the facts either because it requires direct contact between the Broker or Broker's agents and the

purchasers who receive information from the Broker. I conclude "B" requires direct contact because "B" does not say "direct or indirect" as used in other parts of the contract and the tail provision itself and thus appears to be intentional and specific.

Section "C" appears to fit the facts proven in this case. Given a reasonable interpretation and based upon the rules applicable to the construction and analysis of contracts, Section "C" says that if a buyer purchases the Property based on information secured directly or indirectly from or because of (common meaning for the word "through") a Broker during the term of this agreement a commission is owed.

CP at 465. Among the court's findings were that since Prudential selected the generic MLS agreement, it was effectively the drafter of the agreement.

¶17 Having found for Prudential, the trial court also addressed a dispute over the amount of the commission owed that arose because the Eastmans purchased more acreage from the Youngs than had been listed with Prudential. Given our disposition of the appeal, we do not address the evidence presented on that issue or the court's resolution.

¶18 The court later entered findings and conclusions and a judgment awarding Prudential damages and contractual attorney fees. The Youngs appeal.

## ANALYSIS

¶19 The Youngs make six assignments of error that they characterize as "interrelated" and that they argue jointly; the overarching issue presented is whether the trial court's interpretation of clause C of the tail provision is reasonable.[1] Br. of Appellants at 7. The Youngs' few challenges to

---

[1] The Youngs argue that the trial court construed clause C in a manner that makes clause B meaningless, that it misapplied the timing element of clause C, that it misapplied the rule that construes ambiguities against a drafter, that it failed to consider the "object and purpose" of a tail provision, that it granted relief

the trial court's findings of fact are to those that are couched in language used in the tail provision, which the Youngs argue are more in the nature of conclusions of law. We find three of their arguments controlling and, like the Youngs, provide a unified analysis.

¶20 Washington follows the objective manifestation theory of contracts, under which we declare the meaning of what is written rather than what was intended to be written. *Go2Net, Inc. v. C I Host, Inc.*, 115 Wn. App. 73, 85, 60 P.3d 1245 (2003). Our interpretation of a contract can be informed not only by its language but also by its subject matter and objective, all the circumstances surrounding its making, and the reasonableness of the respective interpretations advocated by the parties. *Scott Galvanizing, Inc. v. Nw. EnviroServices, Inc.*, 120 Wn.2d 573, 580-81, 844 P.2d 428 (1993). Our primary goal in interpreting a contract is to ascertain the parties' intent. *Paradise Orchards Gen. P'ship v. Fearing*, 122 Wn. App. 507, 516, 94 P.3d 372 (2004).

¶21 In the first appeal, we held that Prudential's claim "[could not] be resolved as a matter of law on the bases urged by the Youngs." *Young*, 163 Wn. App. at 818. But we pointed out at the same time that the Youngs had belatedly identified legal arguments that we declined to reach. *Id.* at 818 n.3. On remand, the parties renewed cross motions for summary judgment—they clearly continued to view their dispute as one of law, not fact. Although the trial court denied both motions, a threshold observation in its letter opinion following the bench trial was that "[m]ost of the critical facts in this matter are really not disputed." CP at 461. With the parties' focus on remand having become the language of the tail provision rather than the procuring cause doctrine that preoccupied them earlier, we agree with them, and with the ultimate conclusion of the court, that there are no material disputes of fact. Because the parties agree that the contract language controls and the trial court

---

based on an argument never advanced by Prudential, and that several of its conclusions and findings lack a sufficient basis. Br. of Appellants at 7-8.

did not rely on extrinsic evidence to inform its meaning, we determine the contract's meaning as a matter of law, and therefore de novo. *Mut. of Enumclaw Ins. Co. v. USF Ins. Co.*, 164 Wn.2d 411, 424 n.9, 191 P.3d 866 (2008).

¶22 It does not help in interpreting the tail provision that it is flawed by a nonparallel construction. The trial court adjusted for the lack of parallelism when it reformatted the provision into its proposed clauses A, B, and C, but if we refrain from adding words, the applicable language of the third clause of the tail provision says, "If the property . . . is . . . sold . . . within 365 days after the expiration of this Agreement to any person . . . *on information* secured directly or indirectly from or through a Broker during the term of this Agreement, then Seller shall pay Broker the above compensation."[2] CP at 8 (emphasis added).

¶23 As found by the trial court, Dr. Place never provided to his sister the flyer that he picked up. The only "information" he ever provided to her was either the street address of the Young home or its MLS listing number. And he did not provide that until mid-January 2009—after the listing period under Prudential's agreement with the Youngs had expired. The address or MLS listing number he provided did not lead to the purchase because neither Dr. Pat Eastman nor Ms. Gifford was able to find any further information on the property using the information. Instead, what led to Dr. Eastman seeing the home was the fact that her brother accompanied her on her home tour on January 24, suggested at that time that they look at the Youngs' property, and led her and Ms. Gifford to it.

¶24 One of the Youngs' arguments against the trial court's construction of the contract is that if buying "on

---

[2] It was pointed out in the course of our internal review that another possible reading of the third clause of the tail provision is, "If the property . . . is . . . sold . . . within 365 days after the expiration of this Agreement to any person to whose attention the Property was brought *on information* secured directly or indirectly from or through a Broker during the term of this Agreement, then Seller shall pay Broker the above compensation." This alternative reading does not affect our analysis, so we do not address it further.

information secured directly or indirectly from or through a Broker" under clause C is broad enough to include seeing a "For Sale" sign, then there is no reason for the more specific clause B. Clause B requires payment of a commission for a postlisting term sale to a buyer "to whose attention the Property was brought through the signs, advertising, or any other action or effort of a Broker." CP at 8. Under the court's interpretation, every clause B buyer who sees a "For Sale" sign would also be a clause C buyer "on information secured directly or indirectly from or through a Broker." "An interpretation of a contract that gives effect to all provisions is favored over an interpretation that renders a provision ineffective, and a court should not disregard language that the parties have used." *Snohomish County Pub. Transp. Benefit Area Corp. v. FirstGroup Am., Inc.*, 173 Wn.2d 829, 840, 271 P.3d 850 (2012). By including both clauses B and C and the disjunctive "or," the parties' agreement plainly treats "information secured . . . from or through a Broker" as something different from the broker's general marketing efforts and should be construed accordingly.

¶25 Another of the Youngs' arguments is that the trial court's interpretation of clause C ignores its requirement that the buyer receive the information "during the term of this Agreement." CP at 8. The trial court reasoned that it was enough that Dr. Place *saw the sign* "during the term of th[e] Agreement," but that reading is not faithful to the grammar of the tail provision. Under clause C, the property must be "sold . . . to any person . . . on information." *Id.* The only reasonable reading of the awkward "sold . . . on information" language is that the *buyer* had the information. "[D]uring the term of this Agreement" is an adverbial clause that addresses when the "information" must be "secured." While the trial court relies on the fact that the information can be secured "directly or indirectly," that does not change the requirement that the information "on which" the property is sold must be "secured" "during the term of this Agreement." *Id.*

¶26 We also agree with the Youngs' argument that the trial court's interpretation of clause C cannot be reconciled with the usual purpose sought to be accomplished by a tail provision. Our Supreme Court has reiterated the protection for the agent generally contemplated by such an agreement several times:

> "[R]eal estate brokerage is a highly competitive business and it is a logical conclusion that the provision was intended to protect the agent beyond the duration of the exclusive agency or right to sell the property in order that he might not be deprived of his compensation for finding and presenting a purchaser *during that period* should the owner sell to him. Without such protection, it would have been an easy matter for the owners to circumvent his right by *postponing acceptance* until the definite time had expired."

*Lloyd Hammerstad, Inc. v. Saunders*, 6 Wn. App. 633, 635-36, 495 P.2d 349 (1972) (emphasis added) (internal quotation marks omitted) (quoting *Clients' Serv., Inc. v. Pupo*, 71 Wn.2d 610, 613-14, 430 P.2d 552 (1967)). This purpose of protecting the broker's right to compensation for success during the listing period is served by our reading of clause C as requiring payment of a commission if a buyer secures information directly or indirectly from or through the broker during the listing period. It is not served by requiring payment where a buyer secures information after the listing period has expired. By contract, the broker's marketing authority ends with the expiration of the listing period. If the broker has no authority to market thereafter, it makes no sense to treat a person who saw a "For Sale" sign during the listing period and mentions it to someone after the listing has expired as if he or she could thereby procure a commission for the broker.

¶27 For these reasons, we interpret clause C of the tail provision as requiring payment of a commission only where a buyer who purchases the listed property during the tail period secured information about the property from or through the broker in a manner different from the activities

addressed by clause B, and secures that information during the period of the listing. Because that did not occur here, we reverse the judgment in favor of Prudential.

¶28 The Youngs request an award of attorney fees for trial and appeal under paragraph 14 of the listing agreement. A party may be awarded contractual attorney fees at the trial and appellate level under any law that grants the right to recover them. RAP 18.1(a). Washington law generally provides for an award of attorney fees when authorized by contract, a statute, or a recognized ground of equity. *Labriola v. Pollard Grp., Inc.*, 152 Wn.2d 828, 839, 100 P.3d 791 (2004); *Cornish Coll. of Arts v. 1000 Va. Ltd. P'ship*, 158 Wn. App. 203, 231, 242 P.3d 1 (2010) (reasonable fees and costs are recoverable where a bilateral contract provision provides such a right). Paragraph 14 of the listing agreement includes a bilateral contractual right to an award of "reasonable attorneys fees and costs, including those for appeals," to the prevailing party. CP at 9.

¶29 To facilitate the identification of reasonable fees and costs that are not duplicative and are limited to successful claims, we award both trial and appellate fees and costs to the Youngs, to be determined by our commissioner, subject to compliance with RAP 18.1(d).

¶30 We reverse and remand with directions to enter judgment in favor of the Youngs, consistent with this opinion.

BROWN, A.C.J., and KORSMO, J., concur.