IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 56531-5-II |
| Respondent, | |
| v. | |
| JEFFREY J. LEPLEY, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, C.J.—After drinking several mimosas over brunch, Jeffrey Lepley crashed his car with his wife in the passenger seat, killing her. The State charged Lepley with vehicular homicide.

At trial, the State offered evidence that Lepley's blood alcohol concentration exceeded the legal limit within two hours of the crash. Even though Lepley's blood was drawn more than two hours after the accident, an expert used retrograde extrapolation to calculate Lepley's blood alcohol concentration within two hours of the accident. The jury convicted Lepley and the trial court imposed a sentence at the high end of the standard sentencing range.

Lepley appeals, arguing that the State presented insufficient evidence to convict him. He contends in part that the State did not adequately establish his blood alcohol concentration within two hours of the accident and that there was insufficient evidence to prove the blood drawn was his blood. He also argues that the trial court erred by declining to impose an exceptional sentence below the standard sentencing range. We affirm Lepley's conviction. We decline to review Lepley's sentence because it was within the standard sentencing range.

FACTS

A.     Background

One morning, Lepley and Trisha, his wife, drove to a restaurant for brunch. They arrived a little after 10:00 a.m. and stayed for two to two-and-a-half hours. While they ate, they drank mimosas. During the meal, waiters repeatedly refilled patrons' glasses with a mimosa mixture. After having brunch, Lepley and Trisha went to a wooden boat museum. They stayed for an hour-and-a-half to two hours.

At around 2:30 p.m. that afternoon, a man was washing a motorcycle in front of his garage when a car drove by "fast enough to get [his] attention." Verbatim Rep. of Proc. (VRP) (Oct. 13, 2021) at 17. He then heard the "squeal of a tire and three consecutive crashes." *Id.*

The man went to investigate the crash and saw a car upside down in a farm field. When he approached the car, he saw a woman in the passenger seat and "the head of a [short-haired] person" in the driver's seat. *Id.* at 19. The man tried to elicit a response from the people in the car, but he was unsuccessful. An officer then arrived at the scene.

Chester Johnston, a firefighter and emergency medical technician, was dispatched to the collision. He approached the car and helped get Lepley out. Trisha was also removed from the car, but she was pronounced dead at the scene.

Johnston helped load Lepley into an ambulance. Travis Hoffman, a Sheriff's Deputy, spoke with Lepley. Lepley "was laying on his back on the gurney" and had "an injury to his ear." *Id.* at 38. Hoffman asked Lepley what had happened and Lepley said he did not remember. Hoffman then asked Lepley if he had been drinking and Lepley responded affirmatively.

Johnston rode with Lepley to a hospital and detected the smell of alcohol on him. Jason Harris, who was also a firefighter and emergency medical technician, rode with Lepley as well and noticed alcohol on Lepley's breath.

Later, Hoffman spoke with Lepley at the hospital. Hoffman did not notice the smell of alcohol at that time. After he obtained a warrant, Hoffman read it to Lepley and provided him with copies. A lab technician subsequently collected samples of Lepley's blood. The technician drew the blood at 5:52 p.m., about three-and-a-half hours after the collision. The blood test showed that at the time the blood was drawn, Lepley's blood alcohol concentration was 0.19 g per 100 mL.

The State charged Lepley with vehicular homicide under RCW 46.61.520(1)(a). A person commits vehicular homicide where their driving proximately causes another person's injury, that person's death is "a proximate result" of the injury, and "the driver was operating a motor vehicle" while "under the influence of intoxicating liquor." RCW 46.61.520(1)(a).

B.      Trial

Lepley's case proceeded to a jury trial. Witnesses testified consistent with the facts stated above. When Hoffman testified, he identified Lepley as the person he interacted with at the scene of the collision and later at the hospital. After Hoffman testified about the blood draw, the State successfully moved to admit a picture of the blood vials into evidence. Lepley's birth date as listed on the vials was different from his birth date as listed in the information charging him with vehicular homicide.

Regarding the blood draw, the parties stipulated that a lab technician "extracted the defendant's blood," mixed "vials of the defendant's blood," and "handed the blood tubes back to" Hoffman. Suppl. Clerk's Papers (CP) at 104. The parties also stipulated that Lepley would not be

3

able to "contest the foundational requirements" of the blood draw. *Id.* The trial court read the following to the jury: "On July 19, 2019, at approximately 5:52 p.m., [a lab technician] was qualified to perform a legal blood draw and followed the required procedures and protocol when she collected samples of blood from Mr. Jeffrey Joel Lepley at Tacoma General Hospital at the request of Deputy Travis Hoffman." VRP (Oct. 18, 2021) at 95.

Scott Powers, a collision reconstructionist with the Pierce County Sheriff's Department, also testified. The trial court certified him as "an expert in the field of reconstruction." VRP (Oct. 13, 2021) at 51. Powers said he was called to the crash. He said he was not "able to conduct any speed calculations as part of [his] investigation," but the vehicle traveled more than 300 feet, which was "not consistent with doing the speed limit." *Id.* at 56, 64. He added that he "was not able to determine why the vehicle ultimately lost control, but it appeared the vehicle lost control as it was coming into a curve." *Id.* at 57. He testified that the vehicle "overcorrected," "slid counterclockwise almost broadside all the way to" a guardrail, hit the guardrail, and rolled down an embankment. *Id.* at 58. Later, technical collision investigator, Nate Condreay, testified that there was "significant damage to the guardrail." *Id.* at 74. "It had been folded back," and several "of the supports had been knocked out." *Id.*

A forensic scientist with the Washington State Patrol Toxicology Laboratory, Madison Fuller, testified about the analysis of Lepley's blood. The trial court certified her as "an expert in the field of chemistry and blood analysis." VRP (Oct. 18, 2021) at 112. First, Fuller said that after testing Lepley's blood, she found that the blood alcohol concentration was 0.19. Next, she learned from the State that the time of the collision was approximately 2:30 p.m. and the time of the blood draw was approximately 5:52 p.m., about three-and-a-half hours later. Then, using that

4

information, she made a calculation on the stand and testified that Lepley's blood alcohol concentration was approximately 0.21 two hours after the collision. She used retrograde extrapolation to make the calculation, explaining that retrograde extrapolation allows her to estimate someone's blood alcohol concentration level "at a time prior to the blood draw." *Id.* at 118. She testified that the "elimination rate of alcohol is linear and constant," so "it can vary, but . . . the average human eliminates .015 grams of alcohol per hour." *Id.* at 119.

When defense counsel cross-examined Fuller, she confirmed that she did not know any personal details about Lepley, such as his weight, how much he had to drink before the collision, or whether he drank on an empty or full stomach. She also confirmed that the .015 figure is "not specific to the individual who is being tested." *Id.* at 124. Defense counsel asked, "So what you're telling the jury is that you have a guess based on this one principle that you're using regarding retrograde extrapolation?" *Id.* at 126. Fuller replied, "I have a theoretical value, yes." *Id.*

Lepley testified last. He said he drove on the road where the collision occurred almost every day. When asked if he remembered the collision itself, he said the last thing he remembered before waking up in the hospital was watching a movie at the wooden boat museum. When asked if he was under the influence of alcohol at any point that day, he said, "I didn't think so." *Id.* at 144.

The jury found Lepley guilty of vehicular homicide.

C.      Sentencing

At Lepley's sentencing hearing, several of Trisha's family members and friends testified about the loss they experienced. At the time of sentencing, Lepley's offender score was zero. The

5

State, noting that Lepley's standard range was 78 to 102 months in prison, recommended 102 months.

Lepley's counsel argued that an exceptional downward sentence of 48 months was appropriate. He contended that such a sentence was "fitting within the facts of this case and the loss, not only that Trisha Lepley's family has suffered, but also the loss that Mr. Lepley has suffered and will continue to suffer long after the prison sentence is over." VRP (Dec. 3, 2021) at 33.

The trial court adopted the State's recommendation and imposed a sentence of 102 months in prison. In explaining its reasoning, the trial court noted the seriousness of the offense, the fact that Lepley's blood alcohol concentration level was more than twice the legal limit, the fact that "Lepley was previously convicted of two serious crimes" in California that had since washed out,[1] the fact that Lepley had taken no steps to engage in chemical dependency treatment since his arrest, and the victim impact statements. *Id.* at 41.

Lepley appeals.

## ANALYSIS

### I. SUFFICIENCY OF THE EVIDENCE

A.      Standard of Review

"Evidence is sufficient to support a guilty verdict if any rational trier of fact, viewing the evidence in the light most favorable to the State, could find the elements of the charged crime beyond a reasonable doubt." *State v. Cardenas-Flores*, 189 Wn.2d 243, 265, 401 P.3d 19 (2017).

---

[1] Lepley's judgment and sentence lists only one assault conviction, but the State and the trial court referred to two assault convictions in the State's sentencing memorandum and in the sentencing hearing.

When reviewing a challenge to the sufficiency of the evidence, we accept the State's evidence as true and draw "reasonable inferences in the State's favor." *Id.* at 266. We consider direct and circumstantial evidence to be "equally reliable," *id.*, although "the existence of a fact cannot rest upon guess, speculation, or conjecture." *State v. Colquitt*, 133 Wn. App. 789, 796, 137 P.3d 892 (2006). We "defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

B.      Evidence of Driving Under the Influence

Lepley argues that the State presented insufficient evidence that, at the time of the collision, he was driving under the influence of alcohol. Regarding the nature of his driving, he contends that "no speed analysis could be calculated because of insufficient data." Br. of Appellant at 11. Additionally, he points out that "law enforcement personnel provided varying descriptions of whether they noted an alcohol odor emanating from [him]." *Id.* at 12.

Lepley also attacks the blood analysis. He notes that the blood draw did not occur until more than three-and-a-half hours after the crash and argues that Fuller's use of retrograde extrapolation to determine his blood alcohol concentration within two hours of the crash was faulty, given that Fuller "didn't know anything about . . . how alcohol might affect him personally." *Id.* at 13. And Lepley argues that the State did not prove that the blood Fuller analyzed belonged to him. We disagree.

A driver commits vehicular homicide where their driving proximately causes another person's injury, that person's death "ensues within three years as a proximate result" of the injury, and "the driver was operating a motor vehicle" while "under the influence of intoxicating liquor .

7

. . as defined by RCW 46.61.502." RCW 46.61.520(1)(a). RCW 46.61.502 states that a person drives "while under the influence of intoxicating liquor" if they have "an alcohol concentration of 0.08 or higher as shown by analysis of [their] breath or blood" within two hours after driving or if they drive a vehicle while "affected by intoxicating liquor."[2] RCW 46.61.502(1)(a), (c). The State can use analyses of blood samples "obtained more than two hours after the alleged driving . . . as evidence that within two hours of the alleged driving, a person had an alcohol concentration of 0.08 or more." RCW 46.61.502(4)(a). And "in any case in which the analysis shows an alcohol concentration above 0.00," the State can use the blood sample to show "that a person was under the influence of or affected by intoxicating liquor." *Id.*

The Washington Supreme Court has found circumstantial evidence sufficient to establish that a person drove under the influence of alcohol. For example, in *State v. Randhawa*, the court held that even without blood draw evidence, there was sufficient evidence "to support a finding by the jury that [the defendant] had consumed intoxicating liquor and that the alcohol had lessened, to an appreciable degree, his ability to drive his automobile."[3] 133 Wn.2d 67, 75, 941 P.2d 661 (1997). The court reasoned that two Washington State troopers said they smelled alcohol on the defendant and several witnesses, including the defendant himself, testified that the defendant had been drinking before the collision. *Id.* at 74. The court further reasoned that the testimony of an eyewitness and an expert witness "supported a conclusion" that the defendant sped, veered out his lane, and "failed to negotiate a sweeping curve" despite favorable driving conditions. *Id.*

---

[2] Lepley was convicted under an older version of the statute. However, the relevant language in the older version and the current version is the same.

[3] Randhawa was convicted under a version of RCW 46.61.520 that recited identical elements of vehicular homicide. Former RCW 46.61.520 (1991).

Viewing the evidence in the light most favorable to the State, it is sufficient to support the jury's guilty verdict here. The trial court certified Fuller, who testified about Lepley's blood alcohol concentration, as an expert witness. Lepley did not object. On both direct examination and cross-examination, Fuller consistently described how she used retrograde extrapolation to calculate what Lepley's blood alcohol concentration was within two hours of the collision. We defer to the jury on matters concerning the credibility of witnesses and the persuasiveness of evidence. A rational trier of fact would be entitled to rely on the fact that Lepley's blood alcohol concentration was 0.19 three-and-a-half hours after the crash, more than twice the 0.08 legal limit. A rational trier of fact could also credit Fuller's conclusion that Lepley's blood alcohol concentration was approximately 0.21 two hours after he crashed the car.

As in *Randhawa*, circumstantial evidence also supports the conclusion that Lepley was driving under the influence of alcohol. The morning of the crash, he drank several mimosas at a restaurant over the course of more than two hours. After a movie at a museum, Lepley got into a one-car collision on a road he drove on almost every day. A collision reconstructionist testified that Lepley lost control of the vehicle and overcorrected, causing the vehicle to broadside a guardrail. He also testified that the vehicle traveled more than 300 feet, at some point hitting a guardrail hard enough to make it fold back. After the collision, two firefighters smelled alcohol on Lepley, and Lepley himself said he had been drinking.

Viewing the evidence in the light most favorable to the State, a rational trier of fact could find beyond a reasonable doubt that Lepley drank before he drove and that he had a blood alcohol concentration of 0.08 or higher within two hours after driving or that the alcohol he consumed influenced his driving.

9

C.    Invited Error

In challenging the sufficiency of the State's evidence, Lepley argues that the State did not prove that the blood Fuller analyzed belonged to him. He notes that the birthdate on the blood vials is inconsistent with his actual birthdate and that "such error creates a reasonable doubt as to the accuracy of the blood results obtained as well as whether the blood in the tubes is [his] blood." Br. of Appellant at 13. We disagree.

"The invited error doctrine 'prohibits a party from setting up an error at trial and then complaining of it on appeal.'" *State v. Ellison*, 172 Wn. App. 710, 715, 291 P.3d 921 (2013) (quoting *State v. Pam*, 101 Wn.2d 507, 511, 680 P.2d 762 (1984), *overruled on other grounds by State v. Olson*, 126 Wn.2d 315, 321, 893 P.2d 629 (1995)). This doctrine prevents a party from stipulating to a fact at trial and then challenging it on appeal. *Id.* at 716. For example, in *Ellison*, we held that where a defendant stipulated to the fact that officers were dispatched to his ex-girlfriend's home in response to a domestic violence call, the invited error doctrine barred him from challenging that fact on appeal. *Id.*

Here, the invited error doctrine prohibits Lepley from challenging the fact that the blood in the vials belonged to him. At trial, Lepley stipulated that the lab technician "followed the required procedures and protocol when she collected samples of blood from Mr. Jeffrey Joel Lepley." VRP (Oct. 18, 2021) at 95; *see also* Suppl. CP at 104. Having stipulated to the fact that the blood was his, the defendant's, Lepley cannot now argue that the blood might have belonged to someone else.

In his reply, Lepley contends that rather than challenging the foundational requirements of the blood draw, he is arguing that the State failed to prove "that the Jeff Lepley on trial is the same person" the State charged. Reply Br. of Appellant at 3. However, we need not address Lepley's

untimely identity defense. "An issue raised and argued for the first time in a reply brief is too late to warrant consideration." *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). A party that raises an issue in this manner waives it. *Ives v. Ramsden*, 142 Wn. App. 369, 396, 174 P.3d 1231 (2008); *see also* RAP 10.3(c) ("A reply brief should . . . be limited to a response to the issues in the brief to which the reply brief is directed."). Lepley did not raise an identity defense below or in his opening brief.

Moreover, the record does not support an identity defense. When Hoffman testified, he identified Lepley as the person he interacted with at the scene of the crash and later at the hospital, where he read Lepley a search warrant for the blood draw. Viewing this evidence in the light most favorable to the State, it is sufficient for a rational trier of fact to conclude that the person on trial was the person who got in the collision.

We affirm Lepley's conviction.

## II. REQUEST FOR EXCEPTIONAL SENTENCE

Lepley argues that the trial court erred when it denied his request for a sentence below the standard sentencing range. He argues that a sentence within the standard range is excessively harsh in this case "given the inherent punishment of losing a loved one." Br. of Appellant at 15. We decline to review Lepley's appeal of his sentence.

"The trial court has discretion to sentence anywhere within the standard range without providing any reasons in support of its decision." *State v. Mail*, 65 Wn. App. 295, 297, 828 P.2d 70 (1992); *see also* RCW 9.94A.585(1) ("A sentence within the standard sentence range . . . for an offense shall not be appealed."). Where "a defendant has requested an exceptional sentence below the standard range[,] review is limited to circumstances where the court has refused to

exercise discretion at all or has relied on an impermissible basis for refusing to impose an exceptional sentence below the standard range." *State v. Garcia-Martinez*, 88 Wn. App. 322, 330, 944 P.2d 1104 (1997).

A court refuses to exercise discretion where it categorically refuses to impose an exceptional sentence "under any circumstances; i.e., it takes the position that it will never impose a sentence below the standard range." *Id.* A court relies on an impermissible basis for refusing to impose an exceptional sentence where "it takes the position, for example, that no drug dealer should get an exceptional sentence down or it refuses to consider the request because of the defendant's race, sex[,] or religion." *Id.* Conversely, where "a trial court . . . has considered the facts and has concluded that there is no basis for an exceptional sentence," the defendant may not appeal the court's exercise of its discretion. *Id.*

Here, Lepley does not allege that the trial court categorically refused to consider his request for an exceptional downward departure from the sentencing range, nor does he argue the trial court denied his request on an improper basis. After considering the facts, the court concluded that there was no basis for imposing an exceptional sentence below the standard range. Lepley may not appeal the standard range sentence the court imposed, and therefore, we decline to review his sentence.

## CONCLUSION

We affirm the jury's guilty verdict because the State presented sufficient evidence to support it. Additionally, we decline to review Lepley's appeal of his standard range sentence.

No. 56531-5-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_Glasgow, CJ_____

Glasgow, C.J.

I concur:

_Cruser, J._____

Cruser, A.C.J.

13

No. 56531-5-II

LEE, J. (concurring) — The parties did not raise the issue of invited error in their briefing; therefore, Jeffery Lepley's sufficiency of the evidence challenge should not be decided on the basis of invited error without the parties having had the opportunity to provide this court with their respective positions on the issue. RAP 12.1(a) ("[T]he appellate court will decide a case only on the basis of issues set forth by the parties in their briefs."); *Wash. Pro. Real Est., LLC v. Young*, 163 Wn. App. 800, 818, n.3, 260 P.3d 991 (2011) ("We will not decide a case on the basis of issues that were not set forth in the parties' briefs."), *review denied*, 173 Wn.2d 1017 (2012). To the extent the majority desired to decide this case on invited error, which neither party raised nor briefed, the majority should have allowed the parties the opportunity to present written argument on the issue of invited error. RAP 12.1(b); *State v. Johnson*, 119 Wn.2d 167, 171, 829 P.2d 1082 (1992) ("If a party has a meritorious argument, which has not been briefed, that is believed to be necessary to the resolution of the case, . . . we may consider the issue pursuant to RAP 12.1(b)."). Therefore, I respectfully disagree with the majority's reliance on invited error to resolve this appeal.

I agree, however, with the majority that when the evidence is viewed in the light most favorable to the State, there is sufficient evidence for a rational trier of fact to conclude that the person on trial was the person who got into the collision. I also agree with the remainder of the majority's opinion.

Lee, J.

14